**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| **UNITED STATES OF AMERICA and STATE OF TENESSEE,** ) ) ) | |
| *ex rel.* ) ) | **CIVIL ACTION NO. _____** |
| **A. DUANE SEABURY,** ) ) | **FILED UNDER SEAL** |
| **Plaintiff/Relator,** ) ) | **PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| **vs.** ) ) | **DO NOT PLACE IN PRESS BOX** **DO NOT ENTER ON PACER** |
| **COOKEVILLE REGIONAL MEDICAL CENTER AUTHORITY, d/b/a COOKEVILLE REGIONAL MEDICAL CENTER, d/b/a COOKEVILLE REGIONAL MEDICAL GROUP, INC., f/k/a CRMC MSO, INC., d/b/a CRMC MSO SUB-1, INC., d/b/a TENNESSEE HEART,** ) ) ) ) ) ) ) ) ) | **JURY DEMAND** |
| **Defendant.** ) | |

**VERIFIED FALSE CLAIMS ACT COMPLAINT**
**AND DEMAND FOR A JURY TRIAL**

Through his undersigned attorneys, *qui tam* Plaintiff A. Duane Seabury ("Relator"), on behalf of the United States of America and the State of Tennessee, for this Complaint against Defendant, Cookeville Regional Medical Center Authority, d/b/a Cookeville Regional Medical Center, d/b/a Cookeville Regional Medical Group, f/k/a CRMC ("CRMG"), MSO, Inc., d/b/a CRMC MSO Sub 1, Inc., a/k/a Tennessee Heart ("Tennessee Heart") (collectively referred to as the "Defendant"), alleges as follows:

# I. __INTRODUCTION__

1.      This is an action to recover damages and civil penalties, on behalf of the United States Government (the "United States" or the "Government") and the State of Tennessee (the Plaintiff "State Government"), arising from false and fraudulent statements, records, and claims made and caused to be made by the Defendant and their agents and employees in violation of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq*., as amended ("the FCA" or "the Act") and the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq*.

2.      This *qui tam* case is brought against Defendant for knowingly defrauding the federal Government and the state Government of Tennessee, in connection with the Medicare, Medicaid, and other federally funded healthcare programs.  As alleged below, since at least July 1, 2010, Defendant has engaged in a scheme to pay improper compensation to physicians to induce them illegally to refer patients, including Medicare and Medicaid patients, to Defendant's hospital for inpatient, outpatient and ancillary services.

3.      The compensation offered to physicians[1] as an inducement for referrals includes overall compensation above fair market value, as evidenced by the Defendant's substantial and consistent losses on its physician practices.[2]  Defendant tolerated such losses only because Defendant is able to recover the losses, plus substantial additional sums, by ensuring the same physicians refer their patients to Defendant's hospital for inpatient and ancillary services.  These referral-driven levels of compensation came in a variety of forms of illegal kickbacks and inducements for patient referrals including, but not limited to, hefty annual salaries paid for what often amounts to agreed or tolerated part-time or non-productive work; excessive bonuses often

---

[1]  The term "physician" throughout the Complaint includes medical doctors, doctors of osteopathy, physicians assistants and nurse practitioners.

[2]  See Exhibit A, CRMG Modified Cash Profit and Loss Statements for each Practice Group for Fiscal Years 2013 and 2014.

based on hospital revenue from physician referrals rather than from professional services personally performed by the referring physicians. Additionally, the terms of the employment contracts between the Defendant and the physicians were not commercially reasonable. The financial relationships between the Defendant and the physicians they employ or contract with implicate the Stark Statute, the federal Anti-Kickback Statute, and the laws and regulations of the State of Tennessee and ethical canons of the medical profession.

4. Defendant has entered into illegal financial relationships with physicians that include unlawful kickbacks for referring large volumes of patients, including Medicare and Medicaid patients, to Defendant's hospital and related facilities in violation of federal law and Tennessee law. Defendant has and continues to submit false or fraudulent claims based on these referrals to the United States to obtain millions of dollars in Medicare and Medicaid reimbursement that they are not legally entitled to receive. Under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A) (2009), such claims are false and fraudulent because the Defendants have no entitlement to payment for such unlawfully obtained referrals.

5. Further, despite knowing that millions of dollars in payments from the federal Government and the State of Tennessee have been received in violation of the Stark Statute's prohibition on receipt of payment for services rendered despite an improper financial arrangement, Defendant has failed to refund these payments as required by the Stark Statute. Under the False Claims Act, 31 U.S.C. 3729(a)(1)(G) (2009), this constitutes a knowing and improper avoidance of an obligation to transmit money to the Government.

6. To conceal its unlawful conduct and avoid refunding payments made on the false claims, Defendant also falsely certified, in violation of the False Claims Act, that the services identified in its annual cost reports were provided in compliance with federal law, including the

prohibitions against kickbacks, illegal remuneration to physicians, and improper financial relationships with physicians. The false certifications, made with each annual cost report submitted to the Government, were part of Defendant's unlawful scheme to defraud Medicare and Medicaid.

7. Defendant's conduct as alleged herein violates the federal False Claims Act (FCA) and the false claims acts and laws of the State of Tennessee.

## II.     HISTORY OF THE FEDERAL FALSE CLAIMS ACT

8. The FCA was originally enacted during the Civil War. Congress substantially amended the Act in 1986 – and again in 2009 and 2010 – to enhance the ability of the United States Government to recover losses sustained as a result of fraud against it.

9. The Act was amended in 1986 because Congress found that fraud in federal programs was pervasive and that the Act, which Congress has characterized as the primary tool for combating fraud against the federal Government, was in need of modernization. Congress intended that the 1986 amendments would create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and would encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

10. Likewise, the 2009 and 2010 amendments were introduced to fill gaps in the coverage of the Act and to correct ambiguities in the drafting and misinterpretations of the intended scope of the Act that had emerged in case law in the more than 20 years that had passed since the 1986 amendments.

11. From the 1986 amendments until May 20, 2009, the FCA prohibited, *inter alia*: (a) "knowingly present[ing], or caus[ing] to be presented, to an officer or employee of the United

States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval" as well as (b) "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31U.S.C. § 3729(a)(1)-(2) (1986).

12.     Until May 20, 2009, "claim" was defined under the Act as "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c) (1986).

13.     As amended in the Fraud Enforcement and Recovery Act of 2009 ("FERA"), the Act now imposes liability upon any person who, *inter alia*: (A) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or, effective June 7, 2008, (B) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)-(B) (2009).

14.     As amended by FERA on May 20, 2009, "claim" now is defined in the Act as "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that – (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government – (I) provides or has provided any portion of the money or property requested or demanded; or (II) will

reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A) (2009).

15.     Additionally, pursuant to the 2009 FERA amendments, a violation of the FCA occurs when any person " . . . knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G) (2009).

16.     In relevant part, the term "obligation" is defined under the Act to include: "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3) (2009).

17.     Any person who violates the Act is liable for a civil penalty of between $5,500 and $11,000 for each false or fraudulent claim, plus three (3) times the amount of the damages sustained by the United States.

18.     The Act allows any person having information about false or fraudulent claims to bring an action for himself and the United States, and to share in any recovery. The Act requires that the complaint be filed under seal for a minimum of sixty (60) days (without service on the Defendant during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit.

19.     The Tennessee Medicaid False Claims Act prohibits similar conduct as that prohibited by the Federal FCA, allows plaintiffs to bring an action on the State's behalf and provides analogous remedies to those provided in the Federal FCA. As set forth below, Defendant's actions alleged in this Complaint also constitute violations of the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*

20.     Based on the foregoing federal and state FCA provisions, *qui tam* plaintiff, Duane Seabury, seeks, through this action, to recover damages and civil penalties arising from the Defendant's knowing fraud against the Medicare and Medicaid programs.

## III.    PARTIES

21.     Plaintiff-Relator, A. Duane Seabury, ("Seabury" or "Relator"), resides at 413 Valley Spring Drive, Mount Juliet, Tennessee 37122, which is within this district. He was employed by the Defendant, CRMC, as Vice President of Physician Services at its Cookeville, Tennessee hospital campus from October 17, 2011, until he was terminated on October 5, 2015. During his tenure, Relator was a member of CRMC's senior management team and reported directly to the Chief Executive Officer and the Chief Operations Officer.  Relator's responsibilities included financial and operational management and oversight of Cookeville Regional Medical Group, f/k/a, CRMC MSO, Inc., ("CRMG") a multi-disciplinary physician practice group owned by the Defendant.  Relator was not responsible for Defendant's cardiology group, Tennessee Heart.  As part of his job duties, Relator reviewed and is familiar with CRMC's financial records at least back to July 1, 2010, including financial records showing the losses CRMC sustained on the CRMG affiliated physician practices it owned.  In addition, Relator was responsible for oversight and management of physician services including physician retention, credentialing functions and financial reporting.  During his employment, Relator attended the monthly meetings of the CRMC Board of Directors, Planning and Finance Committees, and quarterly CRMG Board meetings, the weekly meetings of CRMC Senior Management Team and met once a week with the CRMC CEO, but more recently, the COO. Beginning July 1, 2012, Relator also prepared monthly cash P&L statements for each of the CRMC owned physician groups affiliated with CRMG.

22.     Defendant, CRMC, is a not-for-profit 501(c)(3) organization incorporated in the State of Tennessee and headquartered at 1 Medical Center Boulevard, Cookeville, Tennessee 38501. CRMC operates a 243 bed, short term, acute care, hospital facility in Cookeville. In its recent fiscal year, which ended June 30, 2015, CRMC had total patient revenues of over $515,000,000.00. Since at least 2011, approximately 60% of CRMC's revenue derives from Medicare reimbursements with approximately 10% of revenue coming from Medicaid reimbursements.   CRMC owns physician practices through Cookeville Regional Medical Group ("CRMG"), Tennessee Heart and Cookeville Regional Physicians ("CRP").[3]

## IV.     JURISDICTION AND VENUE

23.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

24.     Although such issue is no longer jurisdictional under the 2010 amendments to the FCA, to Relator's knowledge, there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint, as those concepts are used in 31 U.S.C. § 3730(e).   Moreover, whether or not such a disclosure has occurred, Relator would qualify under that section of the FCA as an "original source" of the allegations in this Complaint. Before filing this action, Relator voluntarily disclosed and provided to the Government the information on which the allegations or transactions in this action are based.   Additionally, Relator has knowledge about the misconduct alleged herein that is independent of, and that would materially add to, any publicly disclosed allegations or transactions that may prove to have occurred without his knowledge.

---

[3]  Medicaid refers to Medicaid and TennCare patients and reimbursements.

25.     Venue is proper in the Middle District of Tennessee because Defendant can be found in and transacts business in this District, including business related to its misconduct.

## V.     APPLICABLE FEDERAL HEALTHCARE PROGRAMS AND LAWS

### A.     The Medicare Program

26.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare Program.   Medicare is a federally-funded health insurance program primarily benefitting the elderly.   Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease.   *See* 42 U.S.C. § 426 *et seq.*   The Medicare program is administered through the Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS").

27.     Part A of the Medicare Program, the Basic Plan of Hospital Insurance, authorizes payment for institutional care, including inpatient hospital services and post-hospital nursing facility care.  *See* 42 U.S.C. §§ 1395c-1395i-4.

28.     Part B of the Medicare Program, the Voluntary Supplemental Insurance Plan, covers outpatient and ambulatory services as well as services performed by physicians and certain other healthcare providers, whether inpatient or outpatient. 42 C.F.R. § 410.3.

29.     To assist in the administration of Medicare Part A, CMS historically has contracted with "fiscal intermediaries."   42 U.S.C. § 1395h.   Fiscal intermediaries, typically insurance companies, have been responsible for processing and paying claims and auditing cost reports.   To assist in the administration of Medicare Part B, CMS contracted with "carriers." Carriers, typically insurance companies, have been responsible for processing and paying Part B claims.   Beginning in November 2006, Medicare Administrative Contractors ("MACs") began replacing both the carriers and fiscal intermediaries.   *See* Fed. Reg. 67960, 68181 (Nov. 2006).

The MACs generally act on behalf of CMS to process and pay Part A and Part B claims and perform administrative functions on a regional level. *See* 42 C.F.R. § 421.5(b).

### A.        Background on Hospital Reimbursement

30.        Generally speaking, hospitals are reimbursed under Medicare Part A for providing services to inpatients. Under the Medicare Part B benefit, hospitals may also be reimbursed for providing services to outpatients. Reimbursement is available under Part B for diagnostic services (those used to determine a diagnosis for a patient such as diagnostic x-rays) and therapeutic services (those that aid a physician in treatment of a patient such as clinic services).

31.        Since 1983, Medicare, Medicaid, and other federally-funded health insurance programs have reimbursed hospitals for inpatient care and emergency department encounters through a prospective payment system based on classification of patients through Diagnosis Related Groups (DRGs). A DRG is a patient classification reimbursement code that is determined based upon a patient's principal diagnosis, ICD diagnoses, gender, age, treatment procedure, discharge status, and the presence of complications or comorbidities. The objective of these classifications is to reimburse hospitals for providing healthcare services to a patient based on the type of patient the hospital is treating and the costs typically incurred by a similarly situated (and reasonably efficient) hospital that is treating a similarly situated patient.

32.        A growing number of hospitals also offer outpatient services through what are known as "provider-based" physicians' offices. Payments to hospitals for these outpatient services are made based on the Outpatient Prospective Payment System (OPPS). OPPS payments are based on Ambulatory Payment Classification (APC) groups. Services within an APC are similar clinically and require similar resource use. "Addendum B," published by CMS, lists all HCPCS/CPT codes and the APC, status indicator, national payment amount, and

coinsurance amount assigned to each code. The APC payment amount, often known as the "technical component" or "facility fee," like DRG payments, is separate from, and in addition to, the professional fee billed for services rendered by physicians to individual patients.

33. In order for a hospital to bill for outpatient services under the APC reimbursement model, the billing practice must qualify as "provider based" according to strict federal regulations. *See* 42 C.F.R. § 413.65. Among other things, the practice must operate under the same license as the hospital, the practice's clinical services must be integrated with those of the hospital, the practice's finances must be integrated with the hospital's, and the practice must be held out to the public as a part of the provider. *Id.* If all provider-based regulatory requirements are met, payment for outpatient services may be made under the APC model. It is the hospital, therefore, that is entitled to the APC payment (the "technical" or "facility" fee). Physicians remain entitled to separate payments for their professional services.

34. When services are rendered in an independent physician's office, or by a hospital-owned practice group that does not qualify as provider-based, Medicare will reimburse the billing entity through a single payment based on the physician fee schedule. This single payment will be higher than the professional fee reimbursed to physicians billing in provider-based facilities because it is intended to cover the office's overhead in addition to the physician's professional services. Many hospitals are eager to acquire practices and set them up as provider-based facilities because, on average, the overall reimbursement from Medicare to provider-based facilities is higher than the reimbursement for the same service to independent physician offices.

35. Defendant, CRMC, owns physician practices that provide medical services including family practice, internal medicine, gastroenterology, endocrinology, nephrology,

cardio vascular surgery, infectious disease, pulmonology, neurology, rheumatology, hospitalist, oncology and cardiology.

36.     Medicare enters into provider agreements with hospitals to establish the hospital's eligibility to participate in the Medicare program.  However, Medicare does not prospectively contract with hospitals to provide particular services for particular patients.

37.     As detailed below, CRMC submitted claims for specific services provided to individual beneficiaries and claims for general and administrative costs incurred in treating Medicare beneficiaries.

38.     As a prerequisite to payment, CMS requires hospitals, including CRMC, to submit annually a Form CMS-2552 (previously form HCFA-2552), more commonly known as the Hospital Cost Report.  Cost reports are the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

39.     Every Hospital Cost Report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

40.     From 2011-2015, the responsible provider official at CRMC, its CEO, was required to certify, and did certify, in pertinent part:

> [T]o the best of my knowledge and belief, it [the hospital cost report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of the health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

41.     For the entire period at issue, the hospital cost report certification page also included the following notice:

Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or were otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

42. Thus, CRMC is required to certify that its filed hospital cost report is (1) truthful, i.e., that the cost information contained in the report is true and accurate; (2) correct, i.e., that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions; (3) complete, i.e., that the hospital cost report is based upon all information known to the provider; and (4) that the services provided in the cost report were billed in compliance with applicable laws and regulations, including the Anti-Kickback and Stark Statutes (described below). Such hospital reports for CRMC for the period 2011 through 2015 were false, in that the services provided in each such report violated Stark and the Anti-Kickback Statutes.

### B.    The Medicaid Program

43. Medicaid was also created in 1965 under Title XIX of the Social Security Act. Funding for Medicaid is shared between the Federal Government and those states participating in the program. Thus, under Title XIX of the Social Security Act ("Medicaid"), 42 U.S.C. § 1396 et seq., federal money is distributed to the states, which in turn provide certain medical services to the poor. Federal Medicaid regulations require each state to designate a single state agency responsible for the Medicaid program. The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX and with the regulations of the Secretary of the United States Department of Health and Human Services ("the Secretary"). After the Secretary approves the plan submitted by the State, the State is entitled each quarter to be reimbursed for a percentage of its expenditures made in providing specific types of "medical

assistance" under the plan. 42 U.S.C. § 1396b(a)(1). This reimbursement is called "federal financial participation" ("FFP").

44.     The amount of federal financial participation in Medicaid spending by each state is calculated each fiscal year in accordance with a formula established under Title XIX, with FFP ranging from a low of 50% in federal funding to more than 75% in FFP, depending on a variety of factors including such things as the relative wealth of the State and its people and the total amount and kinds of expected Medicaid expenditures that are needed or expected. For example, for fiscal year 2012, the FFP for Tennessee was 66.36%.

45.     The Tennessee Department of Finance and Administration is the state agency responsible for administering the Tennessee State Medicaid Program.

46.     Each state's Medicaid program must cover hospital services, 42 U.S.C. § 1396a(1)(A), 42 U.S.C. § 1396d(a)(1)-(2), and each program uses a cost reporting method similar to that used under Medicare.

47.     Each physician who participates in the Medicaid program must sign a Medicaid Provider Agreement with his or her state. Although there are variations in the agreements among the states, all states require the prospective Medicaid provider to agree that he/she will comply with all Federal and State Medicaid requirements, including the fraud and abuse provisions and the Stark and Anti-Kickback Statutes. A provider who fails to comply with these statutes and regulations is not entitled to payment for services rendered to Medicaid patients.

C.     **Other Federal Healthcare Programs**

48.     The Federal Government administers other healthcare programs including, but not limited to, TRICARE, CHAMPVA, and the Federal Employee Health Benefit Program.

49.     TRICARE, administered by the United States Department of Defense, is a healthcare program for individuals and dependents affiliated with the armed forces.

50.     CHAMPVA, administered by the United States Department of Veterans Affairs, is a healthcare program for the families of veterans with 100% service-connected disability.

51.     The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for federal employees, retirees, and survivors.

**D.     The Stark Statute**

52.     A section of the Social Security Act, 42 U.S.C. § 1395nn (commonly known as the "Stark Statute") prohibits a hospital (or other entity providing healthcare items or services) from submitting claims to Medicare or Medicaid (*see* 42 U.S.C. § 1396b(s)) for payment based on patient referrals from physicians who have an improper "financial relationship" (as defined in the statute) with the hospital.

53.     The Stark Statute establishes that providers should not submit claims for items or services referred by physicians who have improper financial relationships with the providers of the items or services.   In enacting the statute, Congress found that improper financial relationships between physicians and entities to which they refer patients can compromise the physician's professional judgment as to whether an item or service is medically necessary, safe, effective, and of good quality.  Congress relied on various academic studies consistently showing that physicians who had financial relationships with medical service providers used more of those providers' services than similarly situated physicians who did not have such relationships. The statute was designed specifically to reduce the loss suffered by the Medicare Program due to such increased questionable utilization of services.

54.     Congress enacted the Stark Statute in two parts, commonly known as Stark I and Stark II.  Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992, by physicians with a prohibited financial relationship with the clinical lab provider.  *See* Omnibus Budget Reconciliation Act of 1989, Pub. Law 101-239, § 6204.

55.     In 1993, Congress amended the Stark Statute (Stark II) to cover referrals for ten additional designated health services.  *See* Omnibus Budget Reconciliation Act of 1993, Pub. Law 103-66, § 13562, Social Security Act Amendments of 1994, Pub. Law 103-432, § 152.

56.     As of January 1, 1995, Stark II applied to patient referrals by physicians with a prohibited financial relationship for the following eleven "designated health services"; (1) inpatient and outpatient hospital services; (2) physical therapy; (3) occupational therapy; (4) radiology; (5) radiation therapy (services and supplies); (6) durable medical equipment and supplies; (7) parenteral and enteral nutrients, equipment and supplies; (8) prosthetics, orthotics, and prosthetic devices and supplies; (9) outpatient prescription drugs; (10) home health services; and (11) clinical laboratory services.  *See* 42 U.S.C. § 1395nn(h)(6).

57.     In pertinent part, the Stark Statute provides:

> (a)     Prohibition of certain referrals
> (1) In general.  Except as provided in subsection (b), if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then – (A) *the physician may not make a referral to the entity* for the furnishing of designated health services for which payment otherwise may be made [by Medicare or Medicaid]; and (B) *the entity may not present or cause to be presented a claim* under this title or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under (A).  42 U.S.C. § 1395nn(a)(1) (emphasis added).

58.     Therefore, a physician is prohibited from making referrals to an entity with which he or she has a financial relationship for designated health services payable by Medicare or Medicaid.  In addition, providers may not bill Medicare or Medicaid for designated health services furnished as a result of a prohibited referral.

59.     Further, *no payment may be made* by the Medicare or Medicaid programs for designated health services provided in violation of 42 U.S.C. § 1395nn(a)(1).  *See* 42 U.S.C. §§ 1395nn(g)(1); 1396b(s).

60.     Finally, if a person collects payments billed in violation of 42 U.S.C. § 1395nn(a)(1), that person *must refund those payments* on a "timely basis", defined by regulation not to exceed 60 days.  *See* 42 U.S.C. § 1395nn(g)(2); 42 C.F.R. § 411.353(d); 42 C.F.R. § 1003.101.

61.     The Stark Statute broadly defines prohibited financial relationships to include any "compensation" paid directly or indirectly to a referring physician.  The statute's exceptions then identify specific transactions that will not trigger its referral and billing prohibitions.

62.     Compensation paid pursuant to a bona fide employment relationship may be considered proper under the Stark Statute, but only if (1) the employment is for identifiable services, (2) the amount of remuneration under the employment (i) is consistent with the fair market value of the services and (ii) is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician, and (3) the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer.

63.     Compensation paid pursuant to a personal services arrangement between a hospital and a physician may also be considered proper under the Stark Statute, but only if

(1) the arrangement is set out in writing, signed by the parties, and specifies the services covered by the arrangement; (2) the arrangement covers all of the services to be provided by the physician to the entity; (3) the aggregate services contracted for do not exceed those that are reasonable and necessary for the legitimate business purposes of the entity of the arrangement; (4) the term of the arrangement is for at least 1 year; (5) the compensation to be paid over the term of the arrangement is to be set in advance, does not exceed the fair market value for the services, is not determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties (unless the agreement falls within the narrowly defined physician incentive plan), and (6) the services do not involve promoting any activity that violates state or Federal law.

64.    Employee physicians as well as those working under personal service arrangements may be compensated through "productivity bonuses" as well.  However, the bonus may only be based on services personally performed by the physician.

65.    In order to qualify for the Stark Statute's exception for indirect compensation arrangements, defined as any instance where compensation flows from the entity providing designated health services through an intervening entity and then to the referral source, each of the following elements to the exception must be established: (1) there must be a written agreement, (2) the compensation must be consistent with fair market value, (3) the compensation may not take into consideration the volume or value of referrals or other business generated by the referring physician, and (4) the agreement cannot violate the Anti-Kickback Statute.

66.    Violations of Stark may subject the physician and the billing entity to exclusion from participation in federal healthcare programs and various financial penalties, including (a) a civil money penalty of up to $15,000 for each service included in a claim for which the entity

knew or should have known that the payment should not be made; and (b) an assessment of three times the amount claimed for a service rendered pursuant to a referral the entity knows or should have known was prohibited.  *See* 42 U.S.C. §§ 1305mm(g)(3), 1320a-7a(a).

67.     In sum, Stark prohibits hospitals from billing Medicare or Medicaid for certain designated health services rendered pursuant to a referral by a physician with whom the hospital has a financial relationship of any type not falling within specific statutory exemptions.  42 U.S.C. § 1395nn. Further, neither Medicare nor Medicaid may pay for any designated health services provided in violation of the Stark Statute.  42 U.S.C. § 1395nn(g)(1), 42 U.S.C. § 1396b(s).  Inpatient and outpatient hospital services are among the designated health services to which the Stark referral and billing prohibitions apply.

### E.     The Federal Anti-Kickback Statute

68.     The Medicare and Medicaid Fraud and Abuse Statute (Anti-Kickback Statute), 42 U.S.C. § 1320a-7b(b), was enacted under the Social Security Act in 1977.  The Anti-Kickback Statute arose out of Congressional concern that payoffs to those who can influence healthcare decisions will result in goods and services being provided that are medically inappropriate, unnecessary, of poor quality, or even harmful to a vulnerable patient population.  To protect the integrity of federal healthcare programs from these difficult to detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.

69.     The Anti-Kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending, or arranging for the purchase of any item for which payment may be made under a federally-funded healthcare

program. 42 U.S.C. § 1320a-7b(b). The statute ascribes liability to both sides of an impermissible kickback relationship.

70. Claims for reimbursement for services that result from kickbacks are rendered false under the False Claims Act. 42 U.S.C. § 1320a-7b(g).

71. The Anti-Kickback Statute contains statutory exceptions that exempt certain transactions from its prohibitions such as contracts for employment or personal services. The personal services safe harbor applies to payments to an agent as long as (1) the agency agreement is in writing and signed by the parties; (2) the agreement specifies all of the services that the agent is to provide for the principal; (3) if "the agency agreement is intended to provide the services of the agent on a periodic, sporadic, or part-time basis" then the agreement must specify the intervals and their schedules and the charges with specificity; (4) the term of the agreement must be not less than 1 year; (5) the aggregate compensation to the agent must be set in advance, "consistent with fair-market value," and not be determined "in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties"; (6) the services must not involve promotion of any activity that violates state or Federal law; and (7) the aggregate services contracted for must not exceed those reasonably necessary to accomplish the business purpose of the entity. 42 C.F.R. § 1001.952(d).

72. The employment safe harbor applies to all remuneration paid by an employer to a bona fide employee "for employment in the furnishing of any item or service for which payment may be made in whole or in part under" any Federal healthcare program. 42 C.F.R. § 1001.952(i). Opinions by the CMS Office of Inspector General that interpret this safe harbor provision, as well as case law enforcing it, have found that this safe harbor provides a clear-cut defense against liability for violating the Anti-Kickback Statute only where a bona fide employee

is compensated exclusively for the provision of professional services that are covered by a federal healthcare program. Any payments to a bona fide employee that are not, in fact, made for the provision of covered professional services do not fall within the safe harbor.

73. The act of referring a patient to a hospital or other provider is not a covered item or service. Therefore, any payments made to an employee in order to compensate that employee for making referrals are not covered by the employee safe harbor. This is true even if the majority of an employee's compensation is for the provision of covered services. As to that portion of the payments that is made to induce referrals and to compensate for an employee's act of referring, the Anti-Kickback Statute is violated and the safe harbor does not apply.

74. Once the Government has demonstrated each element of a violation of the Anti-Kickback Statute, the burden shifts to the Defendant to establish that Defendant's conduct at issue was protected by a safe harbor or exception. The Government need not prove as part of its affirmative case that Defendant's conduct at issue does not fit within a safe harbor.

75. Violation of the Anti-Kickback Statute subjects the violator to exclusion from participation in federal healthcare programs, civil monetary penalties, and imprisonment of up to five years per violation. 42 U.S.C. § 1320a-7(b)(7), 1320a-7a(a)(7).

76. Compliance with the Anti-Kickback Statute is a precondition to participation as a healthcare provider under the Medicare and Medicaid programs.

77. Either pursuant to provider agreements, claim forms, or other appropriate manner, hospitals and physicians who participate in a federal healthcare program generally must certify that they have complied with the applicable federal rules and regulations, including the Anti-Kickback Statute.

78.     Any party convicted under the Anti-Kickback Statute must be excluded (i.e., not allowed to bill for services rendered) from federal healthcare programs for a term of at least five years.  42 U.S.C. § 1320a-7(a)(1).  Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the statute, the Secretary may exclude that provider from the federal healthcare programs for a discretionary period (in which event the Secretary must direct the relevant State agencies to exclude that provider from the State health program, and may consider imposing administrative sanctions of $50,000 per kickback violation.  42 U.S.C. § 1320a-7(b).

79.     The enactment of these various provisions and amendments demonstrates Congress' commitment to the fundamental principle that federal healthcare programs will not tolerate the payment of kickbacks.  Thus, compliance with the Stark and Anti-Kickback Statutes is a prerequisite to a provider's right to receive or retain reimbursement payments from Medicare, Medicaid and other federal healthcare programs.

## VI.     ALLEGATIONS REGARDING DEFENDANT'S WRONGDOING

### A.     Summary of Defendant's Unlawful Conduct

80.     In about 2006, Defendant CRMC initiated an aggressive strategy to increase its control over healthcare delivery around its hospital in Cookeville, Tennessee.  As part of this strategy, CRMC instituted a corporate policy to purchase physician practices and employ physicians in order to control patient referrals for both inpatient and outpatient services, including those covered by federally-funded healthcare programs as well as the designated health services listed in the Stark Statute.  Initially, the physicians were employed by CRMC but operated under the umbrella of its wholly-owned entity CRMC MSO, Inc., which was renamed Cookeville Regional Medical Group, Inc. ("CRMG").  Subsequently, these CRMC employed

physicians increased the number of patients, including Medicare, Medicaid, and other federally-insured patients they referred to the Defendant's Cookeville hospital for outpatient and inpatient hospital services.

81. At the time of Relator's termination on October 5, 2015, Defendant owned medical practice groups in the fields of: endocrinology, family practice, gastroenterology, internal medicine, nephrology, neurology, pulmonary care, rheumatology, cardiology, oncology, hospitalists, and cardiovascular surgery. The CRMG physicians Defendant employed included: Dr. Kastori, Dr. Martin, Dr. Stenzel, Dr. Palmer, Dr. Lisic, Dr. Anbari, Dr. Bertram, Dr. Brener, Dr. Tammana, Dr. Zelig, Dr. Thomas, Dr. Brifkani, Dr. Crowe, Dr. Shamin, Dr. Gaw, Dr. Jani, Dr. Hee, Dr. Henson, Dr. Kona, Dr. Rupanagudi, Dr. Okafor, Dr. Pabolu, Dr. Chapman, Dr. Powell and Dr. Wilson. Defendant owned Tennessee Heart, which included approximately a dozen cardiologists.

82. CRMC accordingly employed greater numbers of physicians and purchased physician specialty practices and brought physicians on as hospital employees. As employees, the physicians are required to refer patients to Defendant's Cookeville hospital for inpatient and ancillary services, except in limited circumstances. In order to make employment by CRMC more attractive to the employed physicians than maintaining their own private practices – i.e., to keep them from terminating their contracts and returning to independent practice or working for competitor hospitals – CRMC has provided and continues to provide, from October 2011 through October 2015, what it knows to be excessive compensation, bonuses, perks, and benefits to its physician employees.

83. CRMC's scheme to control referral revenue through overcompensating employed physicians, as well as physicians contracted under personal service arrangements, is made clear

both from (a) the details of individual deals that have been struck in order to get physicians to sell their practices and sign on as CRMC employees and (b) the pattern of economic trade-offs CRMC has created and maintained between persistent losses Defendant endures in operating the purchased physician practices and the (generally) substantial gains from hospital admissions and ancillary service referrals that CRMC realizes as a result of capturing nearly 100% of the referral business their employee physicians are capable of generating.

84. Consistently, from October 2011 through October 2015, CRMC has lost large sums of money on every physician practice that it owns. Such losses exist because the level of income those practices generate is insufficient to sustain both (a) the substantially above-market salaries, bonuses, and other extravagant perks and benefits CRMC provides the employee-physicians whose practices it either purchased or operates and (b) the other, normal operating expenses required to run those practices.

85. As stand-alone ventures, CRMC's physician practices are not economically viable. In most significant part, this is so because the total package of compensation and benefits CRMC pays the physicians who previously owned the practices, or who have been hired to operate such hospital-owned practices, is not rationally related to the income produced by those physicians while performing the professional services for which they purportedly are being paid.

86. CRMC is thus compensating the doctors, whose practices they own, at levels that not only exceed what CRMC can rationally pay while maintaining a physician practice that could be economically viable on its own merits, but that even more dramatically exceed what CRMC's employee physicians could reasonably expect to earn if those physicians had continued to own and operate the business themselves.

87.     From the financial records of CRMG, Relator has compiled the substantial losses suffered by the Defendant from the CRMG physician practices it owned.  For example, Defendant lost the following annual amounts from its CRMG affiliated physicians:

| Year | Annual Losses |
|------|---------------|
| CY 2011 | 7,076,719.56 |
| CY 2012 | 6,804,603.30 |
| CY 2013 | 5,842,835.42 |
| FY 2014 | 4,082,382.00 |
| FY 2015 | 5,000,000.00 [estimated] [4] |

Although Relator did not prepare or see financial records for CMRC owned Tennessee Heart, during Finance Committee and CRMG Board meetings during the spring of 2015, CEO, Korth, admitted that Tennessee Heart's losses were $5,000,000 during fiscal year 2015.

88.     Since October 2011, CRMC has similarly hired and over-compensated new physicians entering their geographic markets in order to secure for themselves, directly and indirectly, patient referrals that such physicians have or gain the power to control or influence.

89.     At all times relevant to this action, both CRMC and its physician employees have understood and intended that a substantial portion of the compensation that such physicians are paid and the resulting losses CRMC is bearing on those physician practices are tolerated by CRMC only because CRMC tracks the value of referrals obtained by those same physicians and knows that it can more than make up for those losses through the substantial marginal gains in income CRMC realizes by using such arrangements to maximize the referrals it receives from those physicians for inpatient, outpatient and ancillary services.

---

[4]   Losses for 2011, 2012, and 2013 include losses for CRP Group physicians. (See Exhibit B, Comparative Performance Report).

90.     At all times relevant to this action, CRMC also has realized and intended that the referrals it has gained as a result of such arrangements with such physicians would include referrals of Medicare, Medicaid and other federally-insured services.

91.     Relator has significant personal experience with CRMC and its financial arrangements with its employed physicians, having been its Vice President of Physician Services from October 17, 2011, through October 5, 2015.  Relator has seen a variety of ways in which CRMC has funneled excessive compensation to its employed physicians. These include inflated base salaries, unjustified increases in physician compensation, hiring additional employees (for those physicians who generated significant revenue) to prepare the electronic medical records that should have been prepared by the physician, compensated physicians at the full value of the work RVU, (not imposing the full multiple procedure discounts), for each of several medical procedures performed on a patient during one patient encounter, overcompensated physicians for assisting in surgery, extravagant bonuses often based not on personally provided services of the physician and paid physicians other miscellaneous kickbacks, all designed to induce referrals to CRMC.

92.     From July 1, 2010 through October 5, 2015, CRMC's payments to its employed physicians constitute improper financial relationships under the Stark Act that are not subject to safe harbor. Such payments similarly violate federal and the State of Tennessee Anti-Kickback Statutes.

93.     As a result of these payments, the physicians employed by Defendant have increased the number of patients, including Medicare, Medicaid, and other federally-insured patients, they referred to the Defendant for outpatient and inpatient hospital services.

94.     From July 1, 2010 through October 5, 2015, Defendant, CRMC, knowingly submitted (and continues to submit) to Medicare, Medicaid, and other federal healthcare programs claims for reimbursement and claims for interim payment on annual hospital cost reports covering at least the past six years for the medical services provided as a result of these referrals although CRMC knew that the claims were not properly payable and should not have been submitted under the applicable laws and regulations.

95.     On each annual hospital cost report that CRMC has filed over the past six years, the Defendant has falsely certified that the medical services identified therein were provided in compliance with all applicable laws and regulations.

**B.      Payments to Physicians to Induce Referrals in Violation of the Stark and Anti-Kickback Statutes**

**1.  Overview**

96.     From July 1, 2010 through October 5, 2015, Defendant has paid and continues to pay excessive compensation to their employee physicians, as well as physicians working under personal service arrangements, in Defendant's medical, surgical, and primary care practices in order to retain their services and to ensure their substantial referral stream.

97.     As set forth previously, these payments result in consistent and substantial losses to CRMC on its hospital-owned physician practices.  These payments, thus, do not reflect the fair market value of the inpatient and outpatient services for which the payments purportedly compensate the physicians.  Nor are the payments that CRMC makes to such physicians independent of the value of the physicians' referrals.  Rather, a portion of the physicians' compensation is tied directly to the volume of business that they refer to CRMC that employs them as regular or contract employees.  Therefore, these payments create improper financial relationships between the CRMC and its referring physicians.  Further, these payments do not

fall within any safe harbor. Under the Stark and Anti-Kickback Statutes, all services billed as a result of referrals from these physicians are, thus, improper and non-reimbursable. The employment contract between CRMC and Dr. Timothy Powell, dated July 1, 2014, is just such an improper contract.[5]

98. Each physician practice group employed by CRMC is generally treated as its own "cost center". All of the revenues from a CRMG affiliated physician's billings are credited to his/her "cost center". These costs include the physician's salary, the salaries for support staff, and the costs of the facility. If the revenue derived from the physician's professional services and associated facility fees are not sufficient to cover these costs, the hospital will show a loss for that physician cost center. Defendant, CRMC, tracks the losses by CRMG affiliated individual physician by their respective practice groups.

99. CRMC is not concerned about these losses from the perspective of its business plan. This is because, in conjunction with tracking losses CRMC sustains through employment of physicians in office based practices, it also tracks the "contribution margin" realized by its Cookeville hospital as a result of inpatient, outpatient and ancillary serviced referrals that can be traced to each respective physician group. "Contribution margin" is the difference between net total revenue from each physician group's referrals to CRMC and that physician group's operating losses. Controlling and capturing such referrals allows Defendant, CRMC, to ensure that its employed physicians are generating enough inpatient and ancillary service income to the hospital to more than make up for the losses on the excessive outpatient compensation.

100. CRMC's secret internal analysis shows that, uniformly, Defendant with its employed physicians show contribution margins through patient referrals that are large enough

---

[5] See Exhibit C, Employment Contract between Cookeville Regional Medical Center Authority and Timothy Powell, M.D., dated July 1, 2014.

both to offset the losses suffered because of the over compensation of its employed physicians and to result in substantial net gains overall to CRMC.

101.    While such analysis allays immediate concern by CRMC as to the economic viability of paying employee doctors such generous salaries, CRMC remains concerned about the legal risks associated with the potential discovery by federal or state officials of the economic model that drives CRMC's business decisions in this respect.   This is because CRMC understands that its own secret internal analyses of the economic trade-off they are making between physician practice losses and revenues CRMC realizes from associated patient referrals for inpatient, outpatient and ancillary hospital services reveals that CRMC's main financial interest in owning and operating such physician practices is the income they gain from associated patient referrals.

102.    Korth, Williams and Beal closely and secretively guard the specific referral income generated by each of the physicians it employs.   CRMC, therefore, seeks to limit the sharing of such economic analyses, as much as possible, to high-level corporate officers with a need to know such details.   Since the fall of 2014 during CRMC Finance Committee and CRMG Board meetings, Korth justified the physicians group's excessive operating losses, by the downstream revenue those physician groups generated for the Defendant. During the spring of 2015, Korth showed an overhead slide during such Finance Committee and CRMG Board meetings justifying actual physician group losses with their more than offsetting downstream referral revenues.

103.    Defendant, CRMC, and the corporate officers/employees that CRMC assigns to manage its Cookeville hospital (including CEOs, CFOs, Controllers and other high-level officers of Defendant) are involved in this economic structure and well aware of its illegality.   CRMC

senior executives closely monitor and oversee management of the relationship between Defendant's losses on employed physicians and associated "contribution margins" Defendant gains in exchange for those same physicians' referrals.

104. Defendant, CRMC, and particularly its CEO, Paul Korth, and COO, Scott Williams, are involved in this economic structure and well aware of its illegality. Korth and Williams closely monitor and oversee management of the relationship between CRMC's losses on the physician practices it owns and the referral income to its Cookeville hospital generated by these same physicians.

105. Based on Relator's review of CRMC's financial records during his time of employment, Relator has firsthand knowledge that revenue for its Cookeville hospital and CRMG was approximately 60% from Medicare and 10% from Medicaid, TennCare, from 2012 through 2015. These numbers were also confirmed by Korth during discussions at CRMC Finance Committee and CRMG Board meetings, which Relator attended during his four year employment.

### 2. Examples of Referral-Driven Business Decisions By CRMC At Its Cookeville Hospital

106. The referral income numbers secretly tracked by CEO, Korth, COO, Williams, and corporate counsel, Beal, are important for physician practice acquisition and physician hiring decisions. Korth, Williams and Beal approve all such deals. Moreover, whenever these CRMC executives are considering hiring, terminating, disciplining or materially altering the compensation of a physician, they consider that physician's ability to bring referrals to CRMC. Examples of such referral-driven decisions include the following:

a) Because of their high dollar volume of referral business to CRMC, Dr. Wilson and Dr. Chapman negotiated a commercially unreasonable employment contract with

CRMC, described as an exclusive contract, where they cannot be fired or replaced. Korth admitted to Relator that Drs. Wilson and Chapman could not be terminated under the terms of their employment contracts with CRMC.

      b)      Effective July 1, 2015, by order of Beal, with the approval of Korth, the compensation of Dr. Wilson and Dr. Chapman was increased by 5% even though since at least 2012, their cardio-vascular surgery practice had lost $1.0-1.3 Million dollars annually.

      c)      Dr. Bernadette Hee's compensation for 2015 and 2016 should have been reduced for declines in productivity, but Korth decided not to reduce her compensation.

      d)      Dr. Wilson had his physician's privileges at the Cookeville hospital suspended on February 27, 2015, for failure to timely prepare and complete medical records for the patients in his care, which was a requirement of his medical staff privileges with CRMC and his medical ethical obligation. His privileges remained suspended when Relator was terminated on October 5, 2015, but he continued to operate on patients, treat patients, admit patients as though he had full privileges at CRMC's Cookeville hospital. Korth and Beal made the decision to allow Wilson to continue to function at the hospital without privileges for fear of jeopardizing his referral business to the hospital. Such a business decision did not promote continuity of care and was not in the best medical interest of the patients whose charts Dr. Wilson failed to timely complete. Korth and Beal sacrificed patient care for CRMC's bottom line.

      e)      Exhibit D shows other physicians whose CRMC hospital privileges were suspended but their suspensions were not enforced by Beal and Korth to preserve the substantial referral business they generated for CRMC.[6]

      f)      Drs. Wilson and Chapman refused to personally comply with their professional obligations to utilize the Electronic Medical Records (EMR) procedures in

---

[6] See Exhibit D, CRMC Physician Privilege Suspension List, September 16, 2015.

conformance with Meaningful Use Requirements. They demanded that CRMC hire a scribe to prepare all of their electronic medical records. In April or May of 2015, to prevent any interruption in their referrals to CRMC, it hired a scribe for these two physicians. Dr. Hee demanded and was given a second LPN rather than a scribe to assist her. A scribe was demanded by the pulmonary physicians in CRMG to transcribe their EMR. Such a scribe had been authorized by CRMC but not yet employed when Relator was terminated.

g)     Since at least 2010, CRMC has paid fiscal year end and quarterly bonuses to its employed physicians even though their group practices have suffered combined annual losses of several million dollars.

h)     Several of the CRMC owned physician groups, including pulmonology and endocrinology, did not keep customary and regular business hours.

i)     The Defendant entered into commercially unreasonable contracts with its physician employees. For example, the employment contract with Dr. Timothy Powell, effective July 1, 2014, contained compensation provisions at Article V, Section 5.2 that ". . . where Physician shall serve as first assistant to another surgeon he shall be paid as a rate equal to 50% of the work RVU. Additionally, in those surgeries where there are multiple procedures, Physician will receive the full conversion factor for each procedure personally performed by Physician." This compensation was paid to Dr. Powell by CRMC even though the Defendant could not be reimbursed by Medicare or Medicaid for these compensation payments. Such payments constituted referral driven hidden bonuses to Dr. Powell. (See Exhibit C, Dr. Powell's Employment Contract.)

j)      CRMC gave its physicians and their families a professional discount of twenty-five percent (25%) on all hospital charges incurred by themselves or their family members as further inducement for referrals to the hospital.

k)      From October 2011 through October 2015, Defendant paid its employed physicians at rates above fair market value.

l)      From October 2011 through October 2015, Defendant entered into employment contracts with its physician employees that were commercially unreasonable.

m)      From October 2011 through October 2015, Defendant compensated its employed physicians at above fair market rates by, among other things:

1.      Where multiple services provided to a patient during a simple encounter and paying the physician full work RVU reimbursement for each service even though the Defendant would only be reimbursed by Medicare and Medicaid at lesser percentages for each service provided after the first;

2.      Paying its CV surgeons at the 50% Medicare work RVU value when assisting in surgery when Medicare would only reimburse the Defendant at a substantially lesser percentage for the assisting physician's service.

These compensation schemes by Defendant constituted improper referral driven hidden bonuses paid to its physician employees in violation of Stark, Anti-Kickback Statute, and FCA. Relator has firsthand knowledge of such schemes from October 17, 2011, through October 5, 2015.

## VII. RELATOR'S WORK HISTORY AND DEFENDANT'S RETALIATION

107.     Relator, Seabury, earned a B.S. from the University of Florida in 1971 and a MBA from Southern Illinois University in 1980. He was a Captain in the United States Army Medical Service Corp. and became the Commander of HQ and A Company (field hospital) of the 9th Medical Bn., 9th Infantry Division, Ft. Lewis, WA.  Relator has over forty years' experience in health care for profit, not for profit and academic settings, including physician practice management, hospital administration and health care consulting. For over thirty years, Seabury has been involved with health care organization's compliance with federal law and regulations including Medicare and Medicaid rules and regulations, Stark Act, Anti-Kickback Statute and the False Claims Act.[7]

108.     On October 17, 2011, Relator was hired by the Defendant, CRMC, and began work as its Vice President, Physician Services. He was responsible for the day-to-day operations of a multi-specialty medical group of 31 physicians, CRMG, the wholly owned subsidiary of CRMC. Relator was also responsible for billing operations of a second Defendant-owned physician group, Cookeville Regional Physician ("CRP"), which was made up of hospitalists, oncologists, an infectious disease specialist and neurologists.  Beginning in 2012, Relator developed and implemented modified cash accounting and reporting for CRMG. He developed reporting procedures for better analysis of operational performance and improved communications with Defendant's physician employees. Relator also implemented organizational restructuring of CRMG, re-negotiated most payer contracts for CRMG, CRP and Tennessee Heart; implemented a revenue cycle management program; and, assured that IT systems were properly deployed and supported along with adequate staff being available for training.

---

[7]  See Exhibit E, Resume A. Duane Seabury.

109.     In October 2011, when Relator first reported for work with Defendant, he was told by then CEO, Dr. Menachem Langer, to "fix it."[8]  By such comment, Dr. Langer instructed Relator to fix Defendant's wholly owned physician group, CRMG. The reason CRMG needed fixing was because in Fiscal Year 2011, which ended June 30, 2011, CRMG's expenses exceeded its revenues by $7,076,719.56. Every practice group within CRMG operated with substantial financial losses for 2011.  Approximately 90% of CRMG's revenues in Fiscal Year 2011 went to pay physician compensation and bonuses. Similar percentages of CRMG went to pay physician compensation and bonuses each fiscal year from 2012 through 2015.  Defendant made, and continues to make, such payments to its employed physicians to induce those physicians to make patient referrals to Defendant's Cookeville hospital for medical services. Relator, throughout his four year employment with the Defendant, continually made recommendations to CEOs, Langer and Korth, COO, Williams, and Chief Medical Officer, Gleason, to "fix" the problems with the Defendant. Virtually every substantive recommendation made by Relator, was summarily ignored by the Defendant for the remainder of his employment up until the time of his termination on October 5, 2015.

110.     Upon assuming his duties, Relator began meeting with the CRMG management team and requested a briefing from each person about their respective areas of responsibility. The CRMG financial records were made available to and reviewed by Relator, who for the first two and a half years of his employment reported directly to CFO, Korth, who was also President of CRMG. Relator attended the monthly CRMC, Board of Directors' Planning and Finance Committee meetings, quarterly Board meetings of CRMG and the weekly Senior Management Team meetings, which occurred every Monday afternoon.  For the first three years of his employment, Relator met with CFO and later CEO, Korth, every Friday morning for 30 to 40

---

[8]  See Exhibit F, Review and Recommendations for CRMG prepared by Relator in February 2012.

minutes to discuss his activities and the operations of CRMG. In the spring of 2015, change in organizational structure changed Relator's reporting responsibility to COO, Williams. In February 2012, after performing an initial assessment of CRMG, its operations and finances, Relator prepared an eleven page report of his findings and recommendations and delivered it to Dr. Langer, Korth and others.[9]

111.  Relator's assessment identified several problem areas in the management and operation of CRMG, including:

(1)  That CRMG was "not adequately addressing day-to-day operational issues;

(2)  The "current [CRMG] structure provides very limited supervisory control and no time for evaluation of possible staff and operational improvements;"

(3)  The need to "Develop and maintain a cash system of accounting that tracks revenue and expenses... down to the [physician] level in a way that will allow rolling up that information to evaluate specialty performance and [CRMG] performance in addition to being able to factually discuss individual [physician] performance;"

(4)  "There are ... issues related to work ethic versus employment contract terms; chart completion and timely charge submissions; and any acknowledgment of, let alone conformance to, common standards of clinical practice."

(5)  "...there needs to be a complete overhaul of [CRMG's] financial information.... Although we must continue to provide CRMC with

_____

[9]  See Exhibit G, Review and Recommendations for CRMG prepared by Relator in February 2012.

what it needs for reporting, [CRMG] needs to develop accurate information that closely mirror what a physician would see in their private practice. Specifically, revenue and expense information, on a cash basis and accountable down to the provider [physician] are a must. The process now in place distorts actual performance of the [physician] and, ... is just not accurate [or] auditable."

(6) Reflecting on the Senior Management Meeting of January 23, [2012], as it related to reporting, [CRMG] needs cash information as opposed to accrual and our need to get accurate P&L information down to the [physician] level, ... [CRMG] will need at least one more person capable of ... [providing] that additional assistance needed to meet the needs of Accounting while ensuring that the maintenance and reporting of financial information on a cash basis for [CRMG] is timely and accurate."

(7) "My main concern has been the lack of recognition of the basic makeup and 'culture' of a physician practice compared to a hospital."

(8) Changes in the physician compensation structure are the greatest need for making financial improvements for CRMG.

(9) Concerning physician compensation, 'the current RVU methodology is self-defeating in that it does not take into consideration incidents where reimbursement may be limited due to multiple procedures or the use of modifiers; payment is made regardless of whether or not

we are paid; RVUs can be 'gamed'; and there is no recognition of the need to contain practice costs."

(10) "[At this time], every dime and then some of collected revenue is being used to cover the salary and benefit expenses of [physicians] with nothing left for overhead."

112.     Relator received minimal feedback from his Assessment & Recommendations Report, so he began to implement his recommendations, which included preparing cash basis P&Ls for each of the practice groups within CRMG.  The first such cash P&L was prepared in July 2012, with the beginning of the 2013 fiscal year, and such reports continued until Relator was terminated on October 5, 2015.  The results of these reports were very revealing.  For Fiscal Years 2013, 2014 and 2015, every practice group within CRMG lost substantial amounts of money each year.[10]  These losses are reflected in the financial reports prepared by Relator. Relator has firsthand knowledge that Defendant was paying fiscal year end and quarterly bonuses to physicians whose practice groups were suffering combined annual financial losses of over $10.0 Million.  From his review of the past financial records of CRMG, Relator discovered that CRMG had yearly losses of between $6.0 to $8.0 Million beginning at least with Fiscal Year 2010.  The revenue losses for each practice group for Fiscal Years 2013 and 2014 are set forth in the following chart:

---
[10] See Exhibit "A".

### 2013 AND 2014 FISCAL YEAR FINANCIAL LOSSES FOR
### CRMG AFFILIATED PHYSICAL PRACTICE GROUPS

| Practice Group | 2013 Loss | 2014 Loss |
|---|---|---|
| Pulmonary | (412,864) | (696,898) |
| GI | (331,444) | (354,375) |
| Endocrinology | (234,675) | (259,105) |
| CV Surgery | (1,244,575) | (1,246,181) |
| Family Practice/IM | (373,749) | (592,324) |
| Neurology | (601) | (60,709) |
| Nephrology | (296,871) | (229,631) |
| CRMG/Admin. Billing | (709,669) | (465,939) |
| | **3,604,448** | **3,905,162.** |

113. By his reports and financial assessments of CRMG from 2012 through his termination, Relator put Defendant's Senior Management ("Management") on notice that the consistent losses sustained by CRMG were due to the excessive salaries and compensation paid to employed physicians. On many occasions, from October 2011 through October 5, 2015, Relator told Management, including CEO, Korth, and COO, Williams, that such salaries and compensation were above fair market and were not commercially reasonable. Relator's concerns were ignored by CRMC Management. To attempt to convince them that he was correct, in the fall of 2014, Relator provided Korth, Williams, and CRMC Chief Medical Officer, Dr. Jeffrey Gleason, with copies of professional articles about similarly situated not-for-profit regional hospitals in South Carolina, Toumey Healthcare System, and in Florida, Halifax Hospital Medical Center, that were each found guilty of violating the Stark Act, Anti-Kickback Statute and the FCA for paying excessive compensation to its employed physicians in exchange for

referrals.[11] Again, Management ignored Relator and his express concerns in the fall of 2014 that CRMC was in violation of the Stark Act, Anti-Kickback Statute and FCA because it paid its employed physicians excessive compensation.

114.    The Senior Management of CRMC continued to justify the substantial losses sustained by CRMG because of the even more substantial referral income that the employed physicians generated for CRMC's Cookeville hospital.

115.    During Finance Committee meetings of the CRMC beginning in the fall of 2014, CEO Korth admitted that CRMC justified the losses sustained by CRMG by the more than offsetting referral income that the employed physicians generated.  During several of these monthly meetings, which Relator attended, between the fall of 2014 and the summer of 2015, questions were raised about the merits of continuing to sustain CRMG's and Tennessee Heart's financial losses.  Korth's stated responses every time were that such losses were justified by the downstream referral income.  In fact, in the spring of 2015, Korth presented a slide at the Finance Committee meeting and stated that the CRMG financial losses were justified by the more than offsetting CRMG referral revenue realized by CRMC.  The slide showed the CRMG and Tennessee Heart losses and the more than offsetting downstream income from CRMG and Tennessee Heart referrals.   Financial records showing the downstream referral of CRMG physicians were secretly kept and monitored by Korth.

116.    These admissions by Korth prove the guilty knowledge of the Defendant that it was paying excessive salaries to its physicians in exchange for hospital referrals, impermissible under Stark, Anti-Kickback Statute and FCA.

---

[11]    See Exhibit H, Professional Articles which Relator delivered to CRMC Executive Management in the fall of 2014.

117.    The negotiation of physician contracts and adjustments in their compensation was a closely guarded secret.  Such contracts and compensation adjustments were made by CEO Korth, and before him Langer, and corporate counsel, John Beal.  The slide mentioned above also proves that Korth was keeping track of the downstream referral income generated by each physician and physician group for the purpose of paying compensation and bonuses to the referring doctors.  Although he was Vice President of CRMC in charge of physician services, Relator did not participate in physician contract negotiations or compensation adjustments.  But his subordinate, Amanda Manley, CRMG Director of Fiscal Services, was responsible for implementing changes in physician compensation and took directions for such changes directly from Korth or Beal.

118.    Relator repeatedly recommended to CRMC Senior Management, beginning with his February 2012 Assessment, that it hire an outside consultant to review and renegotiate the physician contracts.  That recommendation was implemented with CRMC's March 2015 hiring of the healthcare consultant firm, Dixon Hughes & Goodman ("DHG"), which sent its consultants to Cookeville to interview management, review financials and physician contract agreements, among other things.  Interestingly, soon after DHG arrived at Cookeville, in his Finance Committee presentations, Korth stopped talking about CRMG's financial losses being justified by the downstream referral income.

119.    On September 18, 2015, Paula Duty, CRMC Director of Management Operations, was notified by CMS that it was requesting significant number of Tennessee Heart patient records for review.  Ms. Duty advised Relator of the CMS request, which generated much discussion throughout CRMC management.  Even though Tennessee Heart was not within

Relator's responsibility, based on his 40 years of experience, on September 19, 2015, he offered the following opinions to Williams that during its investigation, CMS will likely:

    (1)     Review the Tennessee Heart records to assess medical necessity;

    (2)     Look at any agreements that may exist to determine whether those agreements served to act as an inducement to order services; and

    (3)     Look at the nature of the relationship between the parties, including any employment relationships between CRMC and physicians.

120.    Sixteen days later on Monday, October 5, 2015, without notice, Relator was called to a meeting with COO, Williams, and the Senior Vice President of Administration/ Human Resources Director and summarily terminated. During the termination meeting, Williams stated that there was no problem with Relator's performance of his duties with CRMC but that it was "going in another direction" and that "your position is being eliminated".

121.    Relator was terminated because a year earlier he had put the senior executive management at CRMC, Korth, Williams and Gleason, on notice that CRMC was in violation of Stark, Anti-Kickback Statute and FCA, and management had done nothing to correct the violations. Relator continued to discuss CRMC's violations with Korth, Williams and Gleason and others during 2014 and 2015. With the CMS investigation of Tennessee Heart just beginning, Relator's continued employment with CRMC was just too dangerous. Relator knew about CRMC's violations of federal and state law. Relator had placed CRMC management on notice of such violations repeatedly and as recently as September 19, 2015. Management knew that if Relator were questioned by CMS investigators about his knowledge of CRMC's violations, he would tell the truth and reveal the violations. Relator's September 19, 2015, notice was only the last of a steady stream of protected conduct by Relator which notified CRMC

management that it was in violation of Stark, Anti-Kickback Statute and FCA. CRMC retaliated against Relator for engaging in such protected activity under § 3730(h), when on October 5, 2015, Relator was terminated.

## VIII.  ESTIMATE OF DAMAGES TO MEDICARE AND MEDICAID

122.    Relator has firsthand knowledge of factual information to permit estimates of CRMC's Medicare and Medicaid revenues from July 1, 2010, through July 1, 2015.  The revenues generated by the physician practice groups under the CRMG umbrella for Fiscal Years 2013 and 2014 were known by Relator because for those years, he prepared cash P&Ls for each practice group. Relator also prepared the P&L figures for 2015 but such figures were unavailable to him due to his summary termination on October 5, 2015.  From the 2013 and 2014 P&L revenue figures and from admissions by CRMC CEO, Korth, estimated projections can be made of total revenues received by CRMC from Medicare and Medicaid for the period July 1, 2009, through July 1, 2015.  Korth admitted at the June 2015 CRMG Board meeting, in Relator's presence, that CRMC's revenue sources over the years were reasonably comparable to CRMG's revenue sources and derived 60% from Medicare and 10% from Medicaid.

123.    The following chart shows total estimated Medicare and Medicaid revenue for each practice group within CRMG for 2013 and 2014:

**FISCAL 2013 AND 2014 MEDICARE AND MEDICAID ESTIMATED
REVENUES FOR EACH CRMG AFFILIATED PRACTICE GROUP**

| Group | 2013 | 2014 | Medicare | Medicaid |
|---|---|---|---|---|
| Pulmonary | 1,546,633 | 1,485,010 | | |
| 60% | 927,979 | 897,006 | 1,824,985 | |
| 10% | 154,663 | 149,501 | | 304,164 |
| | | | | |
| GI | 1,280,884 | 1,323,565 | | |
| 60% | 768,530 | 794,139 | 1,562,669 | |
| 10% | 128,688 | 132,356 | | 261,044 |
| | | | | |
| Endocrinology | | 48,820 | | 48,820 |
| 60% | | | 29,292 | |
| 10% | | | | 4,882 |
| | | | | |
| CV Surg. | 882,964 | 1,114,076 | | |
| 60% | 529,778 | 668,446 | 1,198,224 | |
| 10% | 88,296 | 111,408 | | 199,704 |
| | | | | |
| Fam., P/IM | 626,818 | 663,463 | | |
| 60% | 376,090 | 398,077 | 778,167 | |
| 10% | 62,682 | 66,346 | | 129,028 |
| | | | | |
| Neurology | | 117,063 | | |
| 60% | | 70,238 | 70,238 | |
| 10% | | 11,706 | | 11,706 |
| | | | | |
| Nephrology | 462,536 | 502,339 | | |
| 60% | 276,922 | 301,403 | 578,325 | |
| 10% | 46,153 | 50,234 | | 96,387 |
| | | | | |
| | | **TOTALS** | 6,006,008 | 698,263 |

These totals are for the combined 2013 and 2014 fiscal years for the CRMC physicians working

under the CRMG umbrella. All of these referrals are tainted by the illegal compensation and

benefits which CRMC knowingly paid to such physicians in violation of Stark, Anti-Kickback

Statute and FCA. Thus, for 2013 and 2014, all Medicare and Medicaid reimbursements were the

total damages sustained for that period by the federal Government and the State of Tennessee

due to CRMC's illegal contracts with such physicians. A reasonable assumption can be made

that roughly the same illegal reimbursements to physicians occurred 2009-2012 and during 2015. For the five year period 2010 through 2015, total Medicare reimbursements were approximately $18.0 Million and total Medicaid reimbursements were approximately $2.1 Million, paid to CRMG affiliated physicians.

124.    A reasonable projection can be made for the illegal Medicare and Medicaid reimbursements to Tennessee Heart from a significant admission made by Korth during a CRMC Finance Committee meeting in the summer of 2015. Korth admitted that for Fiscal Year 2015, Tennessee Heart had losses of approximately $5.0 Million. The CRMG affiliated physician practice groups also had combined losses of approximately $5.0 Million for Fiscal Year 2015. Since their losses were approximately the same, a reasonable assumption is that the Medicare and Medicaid reimbursement revenue paid to Tennessee Heart physicians was also the same for 2015 as for the CMRG physicians combined. A further assumption that such reimbursed revenues paid to Tennessee Heart physicians for the entire period 2012-2014 were also the same is not unreasonable.[12] Therefore, it is reasonable to assume that from 2012-2015, Tennessee Heart's total Medicare reimbursements were approximately $12.0 Million and total Medicaid reimbursements were approximately $1.4 Million.

125.    Therefore, the total Medicare and Medicaid reimbursements paid to Tennessee Heart and CRMG physicians that were tainted by their illegal employment contracts with CRMC were at least $30.0 Million and $3.5 Million, respectively. These figures do not include the equally tainted reimbursements paid by Medicare and Medicaid to CRMC for the downstream hospital and diagnostic services it charged as a direct result of its illegal physician contracts. Under the FCA and Tennessee law, the total treble damages recoverable against the Defendant only begin at $90.0 Million and $10.5 Million, respectively.

---

[12]  Tennessee Heart was purchased by CRMC January 1, 2012.

## COUNT I

### False Claims Act
### 31 U.S.C. § 3729(a)(1) & (3) (1986)
### 31 U.S.C. § 3729(a)(1)(A) & (C) (2009)

126.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 126 above as though fully set forth herein.

127.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.* as amended.

128.     With respect to acts occurring prior to the effective date of the 2009 False Claims Act amendments, by and through the acts described above, Defendant has knowingly presented, or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

129.     With respect to acts occurring on or after the effective date of the 2009 False Claims Act amendments, by and through the acts described above, Defendant has knowingly presented or caused to be presented false or fraudulent claims for payment or approval.

130.     The Government, unaware of the falsity of all such claims made or caused to be made by Defendant, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendant's illegal conduct.

131.     By reason of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

132.     Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

## COUNT II

### False Claims Act
### 31 U.S.C. § 3729(a)(2)-(3) (1986)
### 31 U.S.C. § 3729(a)(1)(B)-(C) (2009)

133.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 133 above as though fully set forth herein.

134.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.* as amended.

135.    With respect to acts occurring prior to the effective date of the 2009 False Claims Act amendments, by and through the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government.

136.    With respect to acts occurring on or after the effective date of the 2009 False Claims Act amendments, by and through the acts described above, Defendant knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

137.    The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendant, has paid and continues to pay claims that would not be paid but for Defendant's illegal conduct.

138.    By reason of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

139.    Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

## COUNT III

### False Claims Act
### 31 U.S.C. § 3729(a)(1)(G) (2009)

140.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 140 above as though fully set forth herein.

141.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq*. as amended.

142.     By and through the acts described above, Defendant has knowingly concealed and improperly avoided an obligation to pay money to the Government, including specifically Defendant's obligation to report and repay past overpayments of Medicare and Medicaid claims for which Defendant knew refunds were properly due and owing to the United States Government.

143.     The Government, unaware of the concealment by the Defendant, has not made demand for or collected the years of overpayments due from the Defendant.

144.     By reason of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

145.     Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

### COUNT IV

### Tennessee Medicaid False Claims Act
### Tenn. Code Ann. § 71-5-182(1)(A)-(D)

146.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 146 above as though fully set forth herein.

147.     This is a claim for treble damages and penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §71-5-182(1)(A)-(D).

- 48 -

148.     By and through the acts described above, Defendant has conspired to and, in fact, knowingly presented or caused to be presented, false or fraudulent claims to the State of Tennessee in order to obtain Government reimbursement to which Defendant was not entitled for healthcare services provided under Medicaid and other state-funded healthcare programs.

149.     By and through the acts described above, Defendant has conspired to and, in fact, knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

150.     The State of Tennessee, unaware of the falsity of all such claims made or caused to be made by Defendant, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendant's illegal conduct.

151.     In addition, by and through the acts described above, Defendant has conspired to and, in fact, knowingly concealed and improperly avoided an obligation to pay money to the Government, including specifically Defendant's obligation to report and repay past overpayments of Medicaid claims for which Defendant knew refunds were properly due and owing to the State of Tennessee.

152.     The Government, unaware of the concealment by the Defendant, has not made demand for or collected the years of overpayments due from the Defendant.

153.     By reason of Defendant's acts, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

154.     Additionally, the State of Tennessee is entitled to the maximum penalty of up to $25,000, as adjusted under the Federal Civil Penalties Inflation Adjustment Act of 1990, for each and every violation alleged herein.

**COUNT V**

**Retaliation in Violation of 31 U.S.C. § 3730(h)**

155.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 155 above as though fully set forth herein.

156.    After his reports of illegality to Defendant, more specifically his report of illegality to Defendant's senior executives, Korth, Williams, and Gleason, on September 19, 2015, *qui tam* Plaintiff was terminated from his employment with Defendant as a result of his lawful acts done in furtherance of this action.   This firing was in violation of 31 U.S.C. § 3730(h).

157.    As a direct and proximate result of this unlawful and discriminatory firing, Plaintiff has suffered emotional pain and mental anguish, together with lost wages and special damages associated with his efforts to obtain alternative employment, in an amount to be proven at trial.

**PRAYER**

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

1.    That Defendant ceases and desists from violating 31 U.S.C. § 3729, *et seq.*

2.    That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained because of Defendant's actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

3.    That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of Tennessee has sustained because of Defendant's actions, plus a civil penalty of $11,000 for each violation of the Tennessee False Claims Act;

4. That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of Tennessee has sustained because of Defendant's actions, plus a civil penalty of $25,000 for each violation of the Tennessee Medicaid False Claims Act;

5. That Plaintiff be awarded the maximum amount allowed pursuant to § 3730(h) of the False Claims Act and the laws of the State of Tennessee;

6. That Plaintiff be awarded all costs of this action, including attorneys' fees and expenses; and

7. That the United States, State of Tennessee, and the Relator recover such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury.

_A. Duane Seabury_

A. Duane Seabury

STATE OF TENNESSEE  )
  )
COUNTY OF DAVIDSON  )

## **VERIFICATION**

Appeared before me the undersigned Notary Public, A. Duane Seabury who, after being placed under oath, did depose and say the following:

My name is A. Duane Seabury and I am over the age of twenty-one (21) years, of sound mind and not under the influence of any drugs or medications. I have reviewed the foregoing Complaint and each exhibit attached thereto. The statements and information contained in the said Complaint are true and correct and based on either my firsthand knowledge, the contents of the said exhibits or the applicable Federal Acquisition Regulations. I make this Complaint voluntarily as my own free act and deed and further acknowledge that I have not been influenced or coerced to do so.

_A. Duane Seabury_

A. Duane Seabury

Sworn to and subscribed before me
this 6th day of November, 2015

_Tillie Noble_

Notary Public

My Commission Expires: July 8 2019

Respectfully submitted,

Trevor W. Howell, #9496
Attorney at Law
The Pinnacle at Symphony Place
150 Third Avenue South, 17th Floor
Nashville, TN 37201
(615) 921-4265
thowell@gsrm.com


Ray M. Thompson
62 Kingswood Drive West (36608)
P. O. Box 81177
Mobile, Alabama 36689
 (251) 432-0055
seapitch@bellsouth.net

*Attorneys for Relator*