# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NORTHEASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** *et al.*, *ex rel.* **A. DUANE SEABURY,** ) ) ) | |
| **Plaintiff/Relator,** ) | |
| ) | |
| **v.** ) | |
| ) | **Case No. 2:15-cv-00065** |
| **COOKEVILLE REGIONAL** ) | **Judge Aleta A. Trauger** |
| **MEDICAL CENTER AUTHORITY,** ) | |
| **d/b/a COOKEVILLE REGIONAL** ) | |
| **MEDICAL CENTER, d/b/a** ) | |
| **COOKEVILLE REGIONAL** ) | |
| **MEDICAL GROUP, INC., f/k/a CRMC** ) | |
| **MSO, INC., d/b/a CRMC MSO SUB-1,** ) | |
| **INC., d/b/a TENNESSEE HEART,** ) | |
| ) | |
| **Defendant.** ) | |

## <u>MEMORANDUM and ORDER</u>

Currently pending is the Motion for Summary Judgment filed by defendant Cookeville Regional Medical Center Authority ("CRMC"). (Doc. No. 75.) Two other motions have been filed in connection with that motion: (1) the Motion to Strike, for Issue Preclusion and Adverse Inferences (Doc. No. 83) filed by plaintiff/relator Duane Seabury (hereinafter simply referred to as the "plaintiff"), to which the defendant has responded (Doc. No. 89), and the plaintiff has filed a Reply (Doc. No. 90); and (2) CRMC's Motion for a Protective Order (Doc. No. 91), to which the plaintiff has filed his Opposition (Doc. No. 93). The plaintiff also filed a Motion to Seal his Opposition to the Motion for Protective Order and the documents attached to that Opposition (Doc. No. 94), likely in light of the pendency of the Motion for Protective Order and the fact that the court already granted the plaintiff's Motion to Seal.

The court finds it expedient to address these motions in advance of the Motion for Summary Judgment. For the reasons set forth herein, each of these motions will be denied.

## I.     MOTION FOR PROTECTIVE ORDER

Citing Rule 26(c) of the Federal Rules of Civil Procedure and Local Rule 5.03, the defendant seeks a protective order "forbidding the reference to, reliance on, or use of" a communication that it contends is subject to the attorney-client privilege—specifically, an email dated September 19, 2015 sent by the plaintiff, in his former capacity as CRMC's Vice President of Physician Services, to John Beal, then CRMC's Chief Legal Officer, and separately to Scott Williams, then CRMC's Chief Operating Officer (the "September 19 email"). As explained below, the court finds that, even assuming the September 19 email would otherwise be covered by the attorney-client privilege, the defendant has, by its conduct, waived the privilege.

Plaintiff Duane Seabury filed his original *qui tam* Complaint on November 10, 2015, asserting claims against CRMC for violations of the False Claims Act and the Tennessee Medicaid False Claims Act and a claim that he had been fired from his position as the defendant's Vice President of Physician Services in retaliation for having engaged in protected conduct under the False Claims Act. (Doc. No. 1, Counts I–V.) Specifically in support of the retaliation claim, the Complaint summarized the contents of the plaintiff's September 19 email and referenced the entire email exchange of which it was a part. Although a copy of the email was not attached to the Complaint, and the Complaint indicated only that the email was sent to Scott Williams, the Complaint clearly notified the defendant that the plaintiff was relying on the communication in support of his retaliation claim. (Doc. No. 1 ¶ 119.)

The Complaint was sealed for two and one-half years, while the United States and Tennessee (collectively, the "Government") investigated the claims. On May 14, 2018, the Government moved to partially lift the seal, and, on May 15, 2018, the court entered an Order

Granting Partial Lift of the Seal, authorizing the Government to provide a copy of the Complaint to the defendant, which it presumably did. (Doc. Nos. 34, 36.)

In February 2020, the Complaint was unsealed conjunction with the Government's election to intervene in part for purposes of settlement and to decline to intervene in part. (*See* Doc. Nos. 52, 53.)[1] Following the defendant's and the Government's settlement of the False Claims Act claims, Seabury filed his Amended Complaint on May 1, 2020, reasserting his retaliation claim. The Amended Complaint, like the original, references the September 19 email. (Doc. No. 64 ¶ 120.) In addition, an unredacted copy of the entire email thread incorporating the September 19 email is attached as Exhibit I to the Amended Complaint. (Doc. No. 64-9.) Besides showing the context of the September 19 email, the exhibit reveals that the email was originally sent to John Beal, Chief Legal Officer, and then forwarded to Scott Williams. In other words, the email has, by now, been in the public record for sixteen months. The defendant has never sought to seal either the Amended Complaint or Exhibit I thereto.

On March 11, 2021, nearly a year after the filing of the Amended Complaint, plaintiff's counsel deposed Scott Williams in his capacity as CRMC's former Chief Operating Officer. During the deposition, plaintiff's counsel referenced the September 19 email; he also entered it as an exhibit to the deposition. Counsel for CRMC noted that the document had been produced by the plaintiff in discovery, and he objected to its introduction into evidence on the basis that the email was "obviously a privileged document." (Doc. No. 91-2, at 4, Williams Dep. 101.) Counsel for Seabury responded that he did not believe the document was privileged, but counsel for CRMC continued to object to any questioning based on the email. At that point, Seabury's counsel ceased

---

[1] The Order unsealing the document specified that all filings in the case following entry of that Order would be unsealed and identified which previously filed documents would remain sealed and which should be unsealed. (Doc. No. 53.)

questioning Williams about the email and indicated that they would "deal with that later." (*Id.* at 5, Williams Dep. 102.) Neither party followed up on the issue following the deposition.

The defendant filed its Motion for Summary Judgment on June 29, 2021. In a footnote to its Memorandum in Support of the Motion for Summary Judgment, the defendant anticipates that the plaintiff would seek to rely on the September 19 email. The Memorandum asserts that the plaintiff "can point to no evidence" of protected activity in support of his retaliation claim, aside from "a privileged communication upon which he cannot rely." (Doc. No. 76, at 12 n.3.)

As the defendant expected, the plaintiff's Opposition to the Motion for Protective Order relies on the September 19 email in support of his retaliation claim. The relevant language from the email is quoted in the Opposition and in Seabury's Declaration (Doc. No. 80, at 14; Doc. No. 81 ¶ 37), and attached as an exhibit to the Declaration (Doc. No. 81-8). On August 2, 2021, the defendant filed a Motion to Seal the plaintiff's Opposition, his Declaration, and Exhibit 8 to the Declaration. The court granted the motion *ex parte*, pending resolution of this Motion for Protective Order. As indicated above, the defendant seeks to have the referenced documents remain permanently under seal and demands that the plaintiff be required to file redacted versions of his Opposition and Declaration, omitting any reference to the September 19 email. The defendant also seeks to bar the plaintiff from relying on the September 19 email in any way. The defendant's motion does not acknowledge the fact that the September 19 email has already been in the public record for well over a year.

The parties assert that Rule 502 of the Federal Rules of Evidence governs the question of privilege and waiver in this case. Rule 502(a) pertains to an "intentional" "disclosure [of a privileged communication] made in a federal proceeding" and addresses only the question of whether the waiver extends to undisclosed communications that "concern the same subject matter"

as the intentionally disclosed communications. Fed. R. Evid. 502(a)(1)–(3). It has no application here.

Rule 502(b) pertains to "inadvertent" disclosures in a federal proceeding. It states that such a disclosure will not operate as a waiver if:

(1) the disclosure is inadvertent;

(2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and

(3) the holder promptly took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B).

Fed. R. Evid. 502(b).

Rule 502's enactment on September 19, 2008, had dual purposes:

(1) to resolve longstanding disputes in the courts about the effect of certain disclosures of communications or information protected by the attorney-client privilege, and (2) to respond to the widespread complaint that litigation costs necessary to protect against waiver had become prohibitive due to the concern that any disclosure (however innocent or minimal) would operate as a subject-matter waiver of all protected communications or information.

*Irth Sols., LLC v. Windstream Commc'ns LLC*, No. 2:16-cv-219, 2017 WL 3276021, at \*6 (S.D. Ohio Aug. 2, 2017) (citing Fed. R. Evid. 502 advisory committee's explanatory note; *Amobi v. D.C. Dep't of Corr.*, 262 F.R.D. 45, 52 (D.D.C. 2009)), *objections overruled*, 2018 WL 575911 (S.D. Ohio Jan. 26, 2018).

Rule 502(b) applies somewhat uneasily in this case, because the circumstances of the initial disclosure do not fit neatly within the typical pattern, as it was the plaintiff, rather than the defendant, who produced the document in discovery and who made the disclosure, while the defendant claims the privilege. Regardless, if the court presumes that the *plaintiff's* disclosure of a "privileged" communication was "inadvertent" on the *defendant's* part, the defendant has not shown that it took reasonable steps to prevent the disclosure or, more importantly, that it took

reasonable steps—or, indeed, any steps—to rectify the "error" following the disclosure of the September 19 email with the plaintiff's Amended Complaint or its production by the plaintiff in discovery. That is, neither upon the filing of the Amended Complaint nor upon the plaintiff's production of the document in discovery did the defendant move for a protective order to "rectify" the plaintiff's disclosure of what the defendant claims to have been a privileged communication. Even following the enactment of Rule 502, courts within the Sixth Circuit have continued to recognize that a "client may waive the privilege by *conduct which implies a waiver of the privilege or a consent to disclosure.*" *In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d 289, 294 (6th Cir. 2002) (citing *United States v. Dakota*, 197 F.3d 821, 825 (6th Cir. 2000)[2]) (emphasis added), *quoted in Lucas v. Gregg Appliances, Inc.*, No. 1:14-CV-70, 2014 WL 6901518, at *2 (S.D. Ohio Dec. 5, 2014).

The defendant's attempt now to protect what it contends is a privileged communication is too little too late. The sealing of the documents filed in connection with the plaintiff's response to the Motion for Summary Judgment had no effect on the statements in the Amended Complaint and the exhibit filed therewith, which remain in the public domain. The court, therefore, finds that the defendant has engaged in conduct that implies a waiver of the privilege or consent to the disclosure.

The Motion for a Protective Order (Doc. No. 91) will be **DENIED**.

## II.     MOTION TO STRIKE

Plaintiff's Motion to Strike, for Issue Preclusion and Adverse Inferences (Doc. No. 83) is premised primarily upon his contentions that the defendant has, "for the first time, impermissibly relie[d] upon a document it now contends to be an expert report," even though it has never

---

[2] In *Dakota*, the Sixth Circuit found implied consent to the disclosure of privileged documents due, in part, to the fact that the party claiming the privilege failed to object to a subpoena or inspection of the documents by the defendants. *Dakota*, 197 F.3d at 825–26.

disclosed or identified an expert it intends to use at trial, and that the defendant refused during discovery to identify the "identity and job duties of all persons who replaced" the plaintiff after his employment was terminated or to disclose the date on which the defendant decided to terminate Seabury. (Doc. No. 83, at 1–2.) The plaintiff characterizes his motion as filed under Rule 37 of the Federal Rules of Civil Procedure, thus apparently intending the striking of the documents to which he objects to function as sanctions for failure to cooperate with discovery.

In response (Doc. No. 89), the defendant argues that the motion is procedurally improper, in that (1) the plaintiff failed to satisfy Local Rule 7.01(a)(1)'s requirement that the moving party meet and confer with the opposing party prior to filing this type of motion; (2) the motion is effectively an untimely discovery-related motion framed as a motion to strike or for sanctions; and (3) a motion to strike is generally an inappropriate vehicle for raising what amounts to a discovery dispute, and the materials the plaintiff seeks to "strike" are not pleadings subject to striking under Rule 12(f). The defendant also disputes the merits of the motion and further contends that, even if it is considered under Rule 37, the plaintiff has failed to establish that any of the relevant factors weighs in favor of the imposition of sanctions. (Doc. No. 89.) The plaintiff filed a Reply (Doc. No. 90), disputing each of the defendant's contentions.

The court finds that the motion is substantively without merit, regardless of whether the plaintiff was required to comply with Local Rule 7.01(a)(1) or whether the motion should be deemed an untimely discovery-related motion.

## A.    The "Expert" Report

First, the plaintiff objects to the defendant's purported reliance on "a document [the defendant] now contends to be an expert report," even though it is "actually a mere engagement letter" and even though the defendant "never identified any expert it would use at trial and never produced any expert report." (Doc. No. 83, at 1.) The plaintiff seeks to exclude any reference to

this "expert report" or reliance on it and, relatedly, seeks to "strike" those portions of the defendant's witnesses' declarations referring to it and all paragraphs of the defendant's Statement of Undisputed Facts that cite those paragraphs of the declarations.

The court's review of the documents to which the plaintiff objects confirms that, as the defendant argues, the defendant is not attempting to rely on an "expert report." The March 9, 2015 engagement letter between CRMC and a consulting firm, Dixon, Hughes, Goodman ("DHG"), which was produced during discovery, is not, by any stretch of the imagination, an expert report. The plaintiff does not explain how an engagement letter with a consulting firm for services to be provided to the defendant before the plaintiff ever filed his complaint (and before his employment was terminated) could qualify as an expert report. And, in fact, he concedes that it is a mere "engagement letter." (Doc. No. 81 ¶ 58; Doc. No. 83, at 1.)

The plaintiff's true objection appears to be to the defendant's reliance on the advice of DHG to explain its decision to terminate the plaintiff's employment. To be clear, the defendant is not offering the testimony of an expert to offer a post-hoc explanation of the validity of, or justification for, the decision. Instead, the defendant's witnesses reference their pre-decision reliance on guidance from the consulting firm in 2015 as part of the defendant's argument that it had a legitimate, non-retaliatory basis for terminating the plaintiff's employment. The plaintiff was apparently contemporaneously aware of the fact that the defendant had engaged this consulting firm,[3] and he has no basis for seeking to exclude reference either to DHG or to the engagement letter on the basis that it constitutes a previously undisclosed expert report. CRMC also

---

[3] The plaintiff contends that the defendant's failure to allow him to have face-to-face contact with DHG in the spring of 2015 constitutes part of its hostile action toward him following his protected conduct. (*See* Doc. No. 83, at 10.)

affirmatively states that it does not intend to rely on any experts in this case. (Doc. No. 58, at 5 n.3.)

The plaintiff has not provided a legitimate basis for excluding the DHG engagement letter or reference to DHG as part of the defendant's evidence of its reasons for terminating Seabury's employment. This portion of the plaintiff's Motion to Strike will be denied.

### B. The Non-Disclosure of Dr. Richard Terry

Next, the plaintiff complains that the defendant's Motion for Summary Judgment impermissibly relies on information that the defendant was required, and failed, to produce during discovery. Specifically, Seabury contends that the defendant was required, under Rule 26, to disclose the name and contact information of any individual "likely to have discoverable information—along with the subjects of than information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." (Doc. No. 83, at 3 (quoting Fed. R. Civ. P. 26(a)(1)(A)(i)).) The plaintiff complains that the defendant did not identify Richard Terry in its initial disclosures "as a witness [it] would use to support [its] defense against Seabury's retaliation claim." (Doc. No. 83, at 3.)

In response, the defendant argues that it did not have any obligation to disclose Dr. Terry under Rule 26(a)(1), as it has no need, and does not intend, to use Dr. Terry as a witness to "support its claims or defenses" or otherwise. (Doc. No. 89, at 3 (quoting Fed. R. Civ. P. 26(a)(1)).) Rather, the defendant argues, Terry does not possess any discoverable information relevant to the defendant's decision to terminate Seabury, since he was hired two months after Seabury's position was eliminated. Reference to his hiring is relevant only to explain the defendant's course of action in deciding to terminate Seabury and address some organizational restructuring taking place at the same time.

As the defendant argues, Rule 26(a)(1) does not require the disclosure of any individual whose identity might be discoverable or who might possess discoverable information. Rather, it requires the disclosure of any individual "likely to have discoverable information . . . that the disclosing party may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(i). "The distinct purpose of the initial disclosure is to alert the opponent to the existence of a witness whose testimony may be helpful to the disclosing party." *Harris v. Advance Am. Cash Advance Ctrs., Inc.*, 288 F.R.D. 170, 171 (S.D. Ohio 2012) (citing 8 Charles Alan Wright, Arthur R. Miller, Richard L. Marcus, Federal Practice & Procedure § 2053 (Supp. 2009)). The court is not persuaded that the defendant's failure to identify Terry violates defendant's initial disclosure obligation.

In his Motion to Strike, the plaintiff also suggests that the defendant failed to identify Terry in response to an interrogatory requesting the "identity and job duties of all persons who replaced Plaintiff, Seabury, after his firing" (Doc. No. 83, at 1), but he does not provide any argument in support of that contention or reproduce the interrogatory requesting that information. Not until his Reply brief does he point to his Interrogatory No. 24(f), which requested "the name of the person . . . hired in place of [Seabury]." (Doc. No. 90, at 2.) The defendant anticipated this argument, asserting in its Response that Terry did not actually assume any of Seabury's job duties. (*Id.* (citing Williams Dep. at 122).) The defendant also argues that it disclosed Dr. Terry's existence to the plaintiff during discovery, but Seabury made no effort to follow up on that disclosure to learn about why Dr. Terry was hired, what his job responsibilities were, or how the fact that he was hired might relate to the defendant's legitimate, non-retaliatory reason for terminating Seabury's position. (*Id.* at 4 (citing Williams Dep. 122).)

In his deposition, Williams was asked about what the plaintiff was told during the meeting during which he was notified that his position was being eliminated and the content of what is

identified in the deposition as "Plaintiff's Trial Exhibit 19." (Doc. No. 89-1, at 1, Williams Dep. 121.) Williams stated that the meeting with Seabury was brief; he was told that the defendant had "made a decision to eliminate his position, that this was nothing about his performance, that he had performed acceptably, but we were making an organizational change and were going to eliminate his position." (*Id.*) In Plaintiff's Trial Exhibit 19, Williams had referred to determining "the appropriate candidate for the new position." (Doc. No. 89-1, at 2, Williams Dep. 122.) Asked what "new position" he was referring to, Williams explained:

> We were going to hire a new physician that we were going to use to work with our medical staff in regards to physician leadership, growth, and discuss with them ways . . . to improve their practice management skills, their leadership skills, and their skills associated with being a physician.

(*Id.*) Williams expressly denied that the new physician hire would assume any of Seabury's job duties. (*Id.* ("Q. Well, and what job duties of Duane Seabury was this new position going to assume? A. None.") Counsel for Seabury and counsel for CRMC quibbled over that response, with Seabury's counsel pointing out that the announcement to CRMG employees that Seabury was no longer employed was contained in the same notice that referenced the new position and opining that a jury was "going to have a hard time with that one." (Doc. No. 89-1, at 2–3, Williams Dep. 122–23.) In response to CRMC's counsel's suggestion that Seabury's attorney "might want to ask [Williams] if he filled" that physician position, Seabury's counsel said, "Well, I probably will." (*Id.* at 3, Williams Dep. 123.) He apparently did not, however, nor did he ask additional questions regarding the identity of the new hire, but he persisted in asking Williams whether he agreed that someone reading Plaintiff's Trial Exhibit 19 "could conclude that the new position would at least be a position that would take on some of Duane Seabury's responsibilities." (*Id.*) Williams stated that he did not agree. (*Id.*)

In other words, the plaintiff was on notice no later than the date of Williams' deposition on March 11, 2021 that the defendant had at least intended to hire someone for a new position not long after Seabury was terminated and that the defendant took the position that this new hire would not take on any of Seabury's job duties. Counsel for Seabury apparently could have, but did not, ask follow-up questions of Williams to discover (1) whether the defendant actually made the new hire contemplated by the notice contained in Plaintiff's Trial Exhibit 19; (2) if so, the identity of that person; and (3) what job duties the new hire was expected to assume.

Williams was deposed in March 2021. On April 1, 2021, the court granted the parties' motion to extend deadlines and imposed a new May 31, 2021 deadline for fact discovery, "without prejudice to seek a further extension for good cause." (Doc. No. 72.) If the plaintiff believed, after deposing Williams, that the defendant had failed to answer adequately his Interrogatory No. 24, he could have moved to compel a more complete answer at that point. He did not. While there may be an unresolved question of fact as to whether Terry actually did take on any of the plaintiff's former job duties, the plaintiff has not established, at this juncture, that the defendant failed to adequately respond to the plaintiff's Interrogatory No. 24.

The court will deny that portion of the plaintiff's motion to "strike" or exclude reference to the defendant's decision to hire Richard Terry or its reasons for doing so.

### C. The Date of the Decision to Terminate the Plaintiff's Employment

In his first set of interrogatories, the plaintiff asked CRMC to identify the individuals involved in the decision to terminate Seabury's employment and the date the decision was made. CRMC answered the interrogatory by identifying the individuals involved in the decision but did not provide the date on which the decision was made. (Doc. No. 83-2, at 5.) It never supplemented its answer, and the plaintiff never moved to compel a more complete answer.

During his deposition, Scott Williams testified that Seabury was notified on October 5, 2015 that he was being terminated, but Williams could not remember the date on which the decision to fire him had been made. (Doc. No. 83-3, Williams Dep. 115–16.) The plaintiff points to evidence in the record that suggests that the decision to terminate Seabury occurred well before October 5, 2015, including purportedly hostile actions that took place from March through June 2015. He also points to a September 14, 2015 email outlining the termination procedure, which suggests that the plan was made earlier than that date. (Doc. No. 83, at 9–10.) Based on the defendant's "refusal" to answer or supplement its interrogatory answer with an actual date on which the termination decision was made, the plaintiff asks for an "adverse inference" that the decision was made in June 2015 and, therefore, was made "in close proximity to his protected, covered conduct." (Doc. No. 83, at 11.)

The court is not persuaded. The plaintiff does not point to evidence in the record suggesting that any witness for the defendant remembers the precise date of the decision to terminate Seabury's position. Certainly there is circumstantial evidence in the record that may indicate when, at least approximately, the decision was made—or show that there is a material factual dispute as to when the decision was made. In addition, the plaintiff argues that case law supports his claim that, to determine whether there is "temporal proximity" between an adverse employment action and protected conduct, the relevant date is the decision to take the adverse employment action rather than the date on which the adverse employment action is communicated to the plaintiff or goes into effect. The appropriate place to raise all of these arguments is within the context of responding to the Motion for Summary Judgment. A motion seeking an adverse inference and sanctions is not appropriate and will be denied.

The plaintiff's Motion to Strike will be denied in its entirety.

### III. CONCLUSION AND ORDER

For the reasons forth herein, the Motion to Strike, for Issue Preclusion and Adverse Inferences (Doc. No. 83) and the Motion for Protective Order (Doc. No. 91) are both **DENIED**. The plaintiff's Motion for Leave to Place Document Under Seal (Doc. No. 94), which preemptively seeks to seal his Opposition to the Motion for Protective Order and the exhibits attached to it, is likewise **DENIED**. The Clerk is **DIRECTED** to **UNSEAL** Documents 80, 81, 81-8, 93, 93-1, 93-2,[4] and 93-3.

It is so **ORDERED**.

_____
ALETA A. TRAUGER
United States District Judge

---

[4] Document 93-2 is the Settlement Agreement, which was already filed, not under seal, by the defendant as an exhibit in support of its Motion for Summary Judgment. (*See* Doc. No. 77-2.)