**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA *et al.*, *ex rel.* A. DUANE SEABURY,** | ) ) ) | |
| **Plaintiff/Relator,** | ) ) | |
| **v.** | ) ) | |
| | ) | **Case No. 2:15-cv-00065** |
| **COOKEVILLE REGIONAL MEDICAL CENTER AUTHORITY,** | ) ) ) | **Judge Aleta A. Trauger** |
| **Defendant.** | ) ) | |

## MEMORANDUM

Before the court is the Motion for Summary Judgment filed by defendant Cookeville Regional Medical Center Authority (CRMCA or CRMC), seeking judgment in its favor on the only claim that remains pending in this case—plaintiff/relator A. Duane Seabury's claim of retaliation in violation of 31 U.S.C. § 3730(h).[1] (Doc. No. 75.) For the reasons set forth herein, the motion will be denied, though the scope of the plaintiff's claim will be substantially narrowed.

## I.    PROCEDURAL BACKGROUND

CRMCA is a quasi-municipal, not-for-profit organization that operates the Cookeville Regional Medical Center (the "hospital"). CRMCA employs approximately 2,400 individuals and provides a full range of health care services to the citizens of Cookeville, Putnam County, and the

---

[1] The defendant acknowledges that Seabury, as relator, is also entitled to statutory attorney's fees, in light of the settlement of the False Claims Act and Tennessee Medicaid False Claims Act claims he brought against the defendant. (*See* Doc. No. 76, at 2 n.1.) However, attorney's fees are an element of damages, the demand for which is set forth in the "Prayer for Relief" section of the Amended Complaint (Doc. No. 64, at 61), rather than the basis for a stand-alone cause of action.

surrounding area. Through separate entities, CRMCA employs various physicians who provide services at the hospital. One of these entities is the Cookeville Regional Medical Group (CRMG). From October 17, 2011 to October 5, 2015, Duane Seabury was employed by CRMCA as Vice President of Physician Services and tasked with, among other things, the financial and operational management and oversight of CRMG.

On November 10, 2015, Seabury filed the sealed *qui tam* Complaint initiating this action, asserting claims under the False Claims Act ("FCA"), 31 U.S.C. § 3729(a), and Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(1), as well as a claim for retaliation under 31 U.S.C. § 3730(h). (Doc. No. 1.) On May 15, 2018, the court granted a partial lift of the seal, which included allowing the Complaint to be shown to CRMCA and its counsel.

On February 10, 2020, the United States and the State of Tennessee (collectively, the "Government") filed a joint Notice of Election to Intervene in Part for Purposes of Settlement and to Decline to Intervene in Part and Motion to Unseal. (Doc. No. 52.) On the same date, the Government, Seabury, and CRMCA executed a Settlement Agreement covering the claims in which the Government had intervened. (Settlement Agreement, Doc. No. 77-2.) In consideration for CRMCA's payment of the settlement amount stipulated in the Settlement Agreement, Seabury, as relator, released all claims set forth in the *qui tam* Complaint against CRMCA, and agreed to their dismissal with prejudice as to him, except for his retaliation claim and demand for attorney's fees. Seabury and the Government agreed that, upon payment of the settlement amount, they would promptly file a joint stipulation of dismissal. (Doc. No. 77-2, at 5.)

On March 10, 2020, Seabury and the Government filed the anticipated Joint Stipulated Motion for Entry of Order of Dismissal in Part, along with a proposed order granting the motion. (Doc. Nos. 56, 56-1.) The court signed and entered the Order of Dismissal in Part the same day.

(Doc. No. 58.) Pursuant to that Order, as relevant here, all claims in this case were dismissed with prejudice as to Seabury, except for his retaliation claim and his claim for attorney's fees and costs pursuant to 31 U.S.C. § 3730(d)(1) and Tenn. Code Ann. § 71-5-183(d). (Doc. No. 58, at 1.) The retaliation claim is premised upon Seabury's allegations that the defendant terminated his employment in retaliation for his having engaged in activity protected by the FCA, including by raising concerns that the defendant was defrauding the Government by violating the fraud and abuse provisions of the Stark Statute ("Stark"), 42 U.S.C. § 1395nn, and the Anti-Kickback Law ("AKL"), 42 U.S.C. § 1320a-7b(b).

On May 1, 2020, Seabury filed his Amended Complaint for Retaliation and Attorneys' Fees Under the False Claims Act. (Doc. No. 64.) Approximately a year later, CRMCA filed its Motion for Summary Judgment (Doc. No. 75), along with a Memorandum of Law (Doc. No. 76) and Statement of Undisputed Material Facts (Doc. No. 77), seeking judgment in its favor on the retaliation claim. The plaintiff filed a Memorandum in Opposition to the motion (Doc. No. 80) and Response to the Statement of Undisputed Material Facts (Doc. No. 96). The defendant filed a Reply (Doc. No. 88), and both parties have filed numerous declarations and other exhibits.

## II.     UNDISPUTED FACTS[2]

### A.     Seabury's Tenure at CRMCA

Seabury was hired on October 17, 2011. When he was first hired, he reported to CRMCA Chief Executive Officer (CEO) Dr. Menachem Langer. Sometime in late 2012, Seabury transitioned to reporting to Paul Korth, who was then CRMCA's Chief Financial Officer (CFO).

---

[2] Where no citation to the record is provided for any given statement of fact, the statement is set forth in the defendant's Statement of Undisputed Material Facts and undisputed in the plaintiff's Response thereto. If there is any dispute, the facts are viewed in the light most favorable to the plaintiff.

In December 2012, Korth replaced Langer as CEO, and Seabury continued reporting to Korth. In the Spring of 2014, CRMCA hired Scott Williams as Chief Operating Officer (COO). Several months after Williams was hired, Seabury began reporting to him rather than to Korth. (Doc. No. 77-1, Korth Decl. ¶ 8; Doc. No. 77-9, Williams Decl. ¶ 5; Doc. No. 77-3, Seabury Dep. 57–58.)[3]

As set forth in his formal job description, Seabury's job duties included "management and oversight" of CRMG, "strategic planning, business planning, program development and management of new product/services, joint ventures and new initiatives, oversight and management of physician services including physician recruitment and retention, credentialing functions and medical staff assistance." (Doc. No. 81-21, at 1.) As Vice President, Seabury had three employees who reported directly to him: Paula Duty, Amanda Manly and Cheryl Myers. Paula Duty handled billing, including billing compliance, and also worked on credentialing; Amanda Manley helped Seabury with the financial aspects of his job, including accounting and preparing financial reports and analysis; and Cheryl Myers handled resource allocation, staffing, working with site managers, and implementation of a new electronic medical records (EMR) system.

As described by Seabury, he was told when he was hired by Dr. Langer that his primary job would be to "fix" CRMG, to get "the group to act like a group and come together as a group." (Seabury Dep. 59.) At the time, CRMG was "a collection of physicians," among whom there was no "collegiality, [no] sense of working together. . . . And they just didn't come together to manage themselves or to push this group forward medically in a constructive manner." (Seabury Dep. at

---

[3] In his deposition, Seabury stated that he began reporting to Williams "several months" after Williams was hired. (Seabury Dep. 58.) In his Declaration, Seabury contradicts his deposition testimony, stating that he did not begin reporting to Williams until June 2015, some fifteen months after Williams was hired. (Doc. No. 77-7, Seabury Decl. ¶ 17.) The court does not find this discrepancy to be material.

60.) According to Seabury, one of the biggest problems for CRMG was the lack of "alignment" between the physicians and the Medical Center. (Seabury Dep. 86–87.) Seabury estimates that, over the four years that he was employed by the defendant, more than fifty percent of his time was "devoted to providing strategic leadership to better align the financial and administrative interests of CRMG with those of CRMC." (Doc. No. 81, Seabury Decl. ¶ 18.) He describes that endeavor as involving, first, conducting a complete review of the group's historical financial records. Upon doing so, he realized that each practice was losing money on a monthly basis. He identified the primary problem as excessive physician compensation and made recommendations to CRMCA to address this problem. He also succeeded in changing the name of the physician group from "CRMC MSO, Inc. d/b/a The Physician Associates of Cookeville Regional" to Cookeville Regional Medical Group (*see* Doc. No. 81-13); changing the accounting for CRMG to the modified cash method in order to more accurately report practice and individual physician profit/loss information; preparing monthly profit/loss statements for CRMG physician practices and individual physicians; negotiating third-party payor contracts, resulting in more favorable terms and higher revenues for CRMG, Tennessee Heart, and Cookeville Regional Physicians; modifying the job descriptions and duties for the individuals who reported directly to him, to allow their job functions to better interface with the interests of CRMCA; removing the hospitalists, and their substantial financial losses, from the CRMG umbrella; evaluating practice management and EMR systems and implementing more user-friendly systems; and providing strategic leadership and recommendations. (Seabury Decl. ¶¶ 14–16, 18.)

However, throughout his tenure at CRMCA, Seabury had difficulty managing CRMG and, in particular, the physicians in the group. Seabury testified that, anytime he did something a doctor in the group did not like, the doctor would "scurry[] right up to the CEO, and then he would reverse

it." (Seabury Dep. 62.) He explained that the CRMG doctors went over his head directly to his supervisor at the time, whether it was Langer, Korth, or Williams, because the supervisors did not give Seabury the authority he needed to properly manage CRMG and did not consider or implement his recommendations "to align CRMG with CRMC." (Seabury Decl. ¶ 12.)

While Langer was CEO, Seabury was unhappy with Langer's management style, in particular as it related to Langer's "pet project"—the development of the defendant's Fairfield Glade campus, located about fifty miles from the defendant's main hospital. (Seabury Decl. ¶ 20.) Seabury expressed concerns to Langer about the project and specifically about Seabury's belief that the rent to be charged to physicians occupying space at the Fairfield Glade campus "would not meet the fair market test and . . . could be construed as an inducement for doctors to refer their patients" to the hospital. (Seabury Decl. ¶ 20.) Due primarily to Langer's verbal abuse of him, in May 2012, less than a year into his employment with CRMCA, Seabury drafted a resignation letter, but Korth, with whom Seabury liked working, talked him out of resigning. (Seabury Decl. ¶ 20; Seabury Dep. 184–85, 199; Doc. No. 77-6, at 4 (May 16, 2012 resignation letter).) Seabury considered leaving again later in 2012, due to his unhappiness with Langer. He applied for a job at West Tennessee Healthcare but withdrew his application when Langer was terminated in late 2012. (Seabury Dep. 194–95.)

In September 2014, Seabury drafted another resignation letter to Korth. (Seabury Dep. 200; Doc. No. 77-7 (Sept. 4, 2014 resignation letter).) At his deposition, Seabury testified that he believed that "there was something going on at that time" that prompted him to "want[] to have it ready in case [he] was asked for it," but he could not remember what was going on. (Seabury Dep. 200.) Whatever the reason was, however, "it must have blown over pretty quickly." (Seabury Dep. 201.) He was still "content" with his job at that point. (*Id.*) In his Response to the defendant's

Statement of Undisputed Facts, Seabury claims that, "upon reflection," he believes that the problem he perceived at the time arose from his having "express[ed] his concerns about Defendant's above fair market value, commercially unreasonable physician contracts and [having] provid[ed] Korth, [CRMC's Medical Director, Dr. Jeffrey] Gleason and [CRMC's legal counsel, John] Beal copies of articles and seminar materials about the Toumey [sic][4] and Halifax hospitals that had been found liable under Stark, Anti-Kickback and False Claims Act law or paid huge settlements for doing the same things Defendant was doing, that he might be fired or asked to resign." (Doc. No. 96 ¶ 32 (citing Seabury Decl. ¶¶ 22–23).) Nothing in Seabury's deposition testimony or Declaration, however, suggests that he had a reasonable basis for believing in 2014 (or 2015) that "he might be fired or asked to resign" (Doc. No. 96 ¶ 32) as a result of his discussions with Korth or Beal or his having forwarded documents discussing the *Tuomey* case to them. Seabury's Declaration testimony, in fact, suggests that neither Beal nor Korth took Seabury's concerns seriously.

**B.**    **Seabury's Termination**

Scott Williams was hired by the defendant as COO in the Spring of 2014. Prior to hiring Williams, CRMCA did not have a COO, because Langer did not believe such a position was necessary. (Seabury Dep. 55.) According to Seabury, Langer's decision not to hire a COO meant

---

[4] The court takes judicial notice that the case to which the plaintiff refers is styled *U.S. ex rel. Drakeford v. Tuomey Healthcare Sys.*, No. 3:05-cv-02858-MBS (D.S.C. Oct. 4, 2005) (Complaint). That case ultimately proceeded to trial, and the jury rendered a verdict against the defendant hospital, finding violations of Stark and the FCA and assessing the monetary value of those violations as totaling $39,313,065. *Id.* (May 8, 2013) (Jury Verdict Form) (Doc. No. 813). The government later filed a Motion for Entry of Judgment, seeking damages and civil penalties in the amount of $237,454.195. *Id.* (May 22, 2013) (Motion) (Doc. No. 818). The district court granted that motion and awarded a monetary judgment against the defendant in the amount sought by the government, in addition to the amount awarded by the jury, and judgment was entered. *Id.* (Oct. 2, 2013) (Amended Order and Opinion, Amended Judgment) (Doc. Nos. 886, 887). The Fourth Circuit affirmed. *U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364 (4th Cir. 2015).

that Korth, who was CFO under Langer, effectively acted as both CFO and COO. (Seabury Dep. 55–56.) According to Korth, while Langer was CEO, CRMCA's day-to-day operations were overseen by three operational vice presidents, including Seabury, instead of by a COO. (Korth Decl. ¶ 5.)

Korth believed that CRMCA needed a COO, so, when he became CEO, he began a search and eventually identified and hired Williams to fill that position. (Korth Decl. ¶ 7.) Williams reported directly to Korth. (Korth Decl. ¶ 7.) The hire of Williams as COO "created a new level of management" within the company. (Korth Decl. ¶ 7; Seabury Dep. 57.) At some point at least several months after Williams was hired, Seabury began reporting to Williams instead of Korth.

In mid-2015, CMRCA retained consulting firm Dixon Hughes Goodman LLP (DHG) to perform an organizational review. (*See* Doc. No. 77-1 (March 9, 2015 Proposed Letter of Engagement).) Although the defendant has not provided a copy of a written report or any other documentation of DHG's work, Williams and Korth testified that DHG ultimately "provided a set of recommendations and made a report to CRMC's Board of Directors," making suggestions as to what CRMCA could do to "increase physician alignment and organizational ownership of operations." (Williams Decl. ¶ 7; Korth Decl. ¶ 12.) Korth explained that, in his view, the "lack of alignment" between CRMCA and CRMG, which had been identified as a problem from at least the time Seabury was hired as Vice President of Physician Services, "meant that the physicians who were affiliated with CRMG did not view themselves as a sufficiently important part of the larger CRMC enterprise, lacked an overall organization cohesiveness, and did not feel like their concerns as physicians were being heard or sufficiently addressed by CRMC management. This was an ongoing management issue between CRMC and CRMG . . . and one of the larger problems

facing CRMC." (Korth Decl. ¶ 13.)[5]

Korth and Williams aver that, among other proposals, DHG suggested that CRMCA hire a physician leader for CRMG to promote unity among the CRMG-employed physicians and consider eliminating unnecessary middle management positions in CRMG. (Korth Decl. ¶ 13; Williams Decl. ¶ 7.) Sometime following their receipt of DHG's report, Korth and Williams met and decided that the operational vice president position occupied by Seabury could be eliminated. (Korth Decl. ¶ 15; Williams Decl. ¶ 8.) Again, DHG's report is not in the record, and Korth and Williams do not identify when it was prepared or made available or when they decided to eliminate Seabury's position. The only indication in the record is that it happened sometime prior to September 14, 2015. (*See* Doc. No. 81-24 (Sept. 14, 2015 email from Williams to Angel Lewis and Mindy Youngblood "outlining [the] steps for the transition with Duane [Seabury]"—that is, the termination of Seabury).) Korth and Williams testified that they believed that terminating Seabury's position was the correct business decision because (1) Williams, as COO, could assume some of Seabury's duties; (2) Seabury's three direct reports (Cheryl Myers, Paula Duty, and Amanda Manly) would continue in their roles and support Williams; and (3) eliminating the operational vice president position would allow CRMCA to hire a physician leader for CRMG to assist with physician issues. (Korth Decl. ¶ 16; Williams Decl. ¶ 9.)

---

[5] As set forth above, Seabury also considered the lack of alignment between CRMG and CRMCA to be a major problem, but he identified his objective as attempting to align the "financial and administrative interests of CRMG with those of CRMC." (Seabury Decl. ¶ 18.) The activities he pinpointed as directed toward achieving that objective, as set forth above, included such things as addressing the problem of excessive physician compensation, changing CRMG's accounting method, preparing monthly profit/loss statements for CRMG physician practices and individual physicians, negotiating third-party payor contracts, and so forth. (*See* Seabury Decl. ¶¶ 14–16, 18.) In other words, although Korth and Seabury both identify the lack of "alignment" between CRMG and CRMCA as a long-standing problem, they apparently have different understandings as to what this lack of alignment entailed and, consequently, as to whether it was part of Seabury's job to address this lack of alignment.

Williams informed Seabury on October 5, 2015 that, although the company had "no complaints" about his "work performance," it was "moving in another direction," and Seabury's position was being eliminated immediately. (Seabury Dep. 162; *see also* Doc. No. 77-12, Williams Dep. 112, 121.) Seabury's position (Vice President of Physician Services) was not filled after he left. (Korth Decl. ¶ 18; Williams Decl. ¶ 11.) Although Seabury stated in his deposition that he did not know if his position was eliminated (Seabury Dep. 163–64), he now states that Dr. Richard Terry was hired fifty-six days after Seabury was terminated to assume some of Seabury's job duties, specifically including attempting to "address the physician alignment issues identified between CRMC and CRMG." (Korth Decl. ¶ 18.)

The defendant, however, claims that, after the elimination of the Vice President of Physician Services position, all of Seabury's previously-held duties were incorporated into the duties of existing personnel. (Williams Dep. 116.) Williams testified that Seabury's financial responsibilities went to the defendant's CFO; his operational responsibilities were re-assigned to Williams; and the CRMG practice director's responsibilities were increased. (Williams Dep. 116.) Williams later stated that, while the "overall management responsibilities" went to him, Seabury's former direct reports, Myers, Duty, and Manly, "continued to handle day-to-day operational responsibilities and reported to [Williams] as they had to Mr. Seabury." (Williams Decl. ¶ 14.)

The defendant asserts that the new position was "created" for a physician and denies that the new hire assumed any of Seabury's duties. (*See* Korth Decl. ¶ 18 ("In order to address the physician alignment issues identified between CRMC and CRMG, we created a new position to be filled by a physician."); *id.* ¶ 19 ("In my opinion as CEO, Dr. Terry was able to provide the physician leadership we needed to address the concerns of lack of alignment between CRMC and CRMG. As a result of his work, and the creation of that position, both CRMC and CRMG worked

better, were more efficient and were able to provide better care to our patients."); Williams Dep. 122 (explaining that the physician position would "work with our medical staff in regards to physician leadership, growth, and discuss with them ways in order to improve their practice management skills, their leadership skills, and their skills associated with being a physician" and denying that the new position would assume any of Seabury's duties).) In other words, although the plaintiff describes his job duties as involving the alignment of the interests of CRMG and CRMCA, it does not appear that the parties are using "alignment" to mean the same thing. (*See* Note 5, *supra*.)

CRMCA eventually eliminated the two other operational vice president positions that were equivalent in level to Seabury's position. Dave Riddell was employed as an operational vice president managing supply chain management. He was permitted to retire on December 26, 2015, and his position was not filled. Stephanie Miller was employed as an operational vice president managing the cardiovascular/oncology service line. She retained her job until she retired on December 17, 2016, and her position was not filled. Williams assumed the management responsibilities of both Riddell and Miller. (Korth Decl. ¶ 21;Williams Decl. ¶ 13.) Today there are no operational vice president positions at CRMCA. These positions were eliminated and never refilled. (Korth Decl. ¶ 20; Williams Decl. ¶ 13.)

## C.    Seabury's Compliance Concerns

Seabury specifically denies that, at any time during his employment, he had any "compliance" responsibilities—that is, any obligation to monitor the hospital's or its physicians' compliance with the FCA, the AKL, Stark, or their implementing regulations—relating to (1) physician compensation, benefits or remuneration; (2) any decisions made by the defendant's CEO, CFO, COO, Chief Legal Officer, or Chief Medical Officer; (3) any decisions made by the entity Tennessee Heart; (4) any decisions made by Scott Clayton, the director of CRMCA's Sleep

Center; or (5) any decisions made by Comptroller Tommye Rena Wells. (Seabury Decl. ¶ 41.) Any compliance responsibilities he had were, instead, limited to "(1) [the] coding of CRMG physician services for billing purposes; (2) attesting that CRMG physicians had met [Centers for Medicare & Medicaid Services (CMS)] [EMR] meaningful use milestones, which attestation was prerequisite to entitle defendant to receive CMS incentive payments; and, (3) HIP[A]A compliance with respect to patient medical records and medical information." (Seabury Decl. ¶ 42.) He acknowledged in his deposition testimony that any individual in a "senior management" position has a "responsibility to the organization to know what's happening, to know when there's a potential problem, or have people below them know when there's a problem and address it." (Seabury Dep. 48.) But the hospital had a compliance officer, and Seabury "didn't see it as [his] job to be a compliance officer." (Seabury Dep. 49.)

The defendant understands Seabury to have identified and raised five compliance concerns with CRMCA's management during his employment—that is, five instances in which Seabury believes he engaged in conduct protected by the FCA—including that: (1) CRMCA provided the physicians at CRMG commercially unreasonable compensation and benefits; (2) the space CRMCA leased at the Fairfield Glade campus was being rented to physicians for below fair market value; (3) there were improper billing practices involving a Dr. Davis and the hospital's Sleep Center; (4) a CMS audit of Tennessee Heart's billing practices posed concern; and (5) and certain physicians had not met required second-level EMR milestones. (*See* Doc. No. 96 ¶ 70 (citing Pl.'s Answer to Def.'s First Set of Interrogatories, No. 9, Doc. No. 77-15, at 6–10).) In addition to these concerns, Seabury now also claims that he identified and attempted to stop CRMCA from violating the FCA when he (1) expressed concern to CRMCA's management that "they were relying upon and considering the volume and value of CRMG and Tennessee Heart physician referrals to the

Defendant to determine such physician's compensation and benefits"; (2) "warned Korth not to mention downstream referral revenues which Defendant received from CRMG and Tennessee Heart physicians to justify their physician practices, which occurred every month for the four years of Seabury's employment"; and (3) "warned DHG not to mention downstream referral revenues in a slide presentation as part of their consulting work for Defendant in June 2015." (Doc. No. 96 ¶ 70 (citing Seabury Decl. ¶¶ 7, 8, 20–52.) The facts in the record relating to the plaintiff's allegedly protected conduct are set forth in more detail below, in the context of discussing whether the identified activities, were, in fact, protected by the FCA.

## III.    STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations—

that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). The non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628. The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* Credibility judgments and weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

## IV.    DISCUSSION

### A.    Legal Standard

The FCA prohibits, among other things, any person from "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval," and "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)–(B). The FCA allows the Attorney General or a private individual to initiate a civil action alleging fraud on the government. 31 U.S.C. § 3730(a)–(b). "A private enforcement action under the FCA is called a *qui tam* action, with the private party referred to as the 'relator.'" *U.S. ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 932 (2009). To protect "whistleblowers" who "pursue or investigate or otherwise contribute to a *qui tam* action, exposing fraud against the United States government," *McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 513 (6th Cir. 2000), the FCA also contains an anti-retaliation provision, which provides a cause of action for damages and other relief to any employee who is discharged or otherwise discriminated against "because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1). Retaliatory discharge claims under the FCA proceed under the same rules applicable to other employment-related retaliation claims, which means that a plaintiff can prove such a claim by presenting "either direct or circumstantial evidence of a retaliatory motive." *Jones-*

*McNamara v. Holzer Health Sys.*, 630 F. App'x. 394, 397–98 (6th Cir. 2015).

The plaintiff here does not claim to have direct evidence of a retaliatory motive, so his claim proceeds under the "familiar *McDonnell Douglas* burden-shifting framework" that applies to retaliation claims that rely on indirect evidence. *Scott v. Metro. Health Corp.*, 234 F. App'x 341, 346 (6th Cir. 2007). First, "[t]o establish a *prima facie* case under § 3730(h), [the plaintiff] must prove that she engaged in a protected activity; her employer knew she engaged in protected activity; and the employer discharged or otherwise discriminated against her as a result of the protected activity." *Miller v. Abbott Labs.*, 648 F. App'x 555, 559 (6th Cir. 2016). If the plaintiff meets that challenge, "the defendant may rebut the presumption of retaliation by asserting a legitimate, non-[retaliatory] reason for its actions." *Id.* (citation omitted). To defeat a motion for summary judgment, "the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." *Macy v. Hopkins Cty. Sch. Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012).

In support of its Motion for Summary Judgment, CRMCA argues that Seabury cannot show that he engaged in "protected activity" under the statute and, even if he could, has no evidence of a causal connection between the purported protected activity and the termination of his employment. The defendant next argues that, even assuming Seabury can establish a *prima facie* case of retaliation, it has presented evidence of its legitimate, non-retaliatory reasons for discharging Seabury, and Seabury cannot show that these reasons are pretext for retaliation. Finally, CRMCA argues that, even if Seabury could show that a material factual dispute exists as to whether his discharge was retaliatory, any potential damages must be reduced by his failure to mitigate his damages and his failure to preserve records related to his attempts to find a new job.

### B.     Protected Conduct Under the FCA

As set forth above, the FCA itself, amended in 2009 and 2010, defines activity protected from retaliation as "lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1). To show retaliatory discharge based on the first type of protected activity, a plaintiff must allege that "the defendant has been put on notice that the plaintiff was either taking action in furtherance of a private *qui tam* action or assisting in an FCA action brought by the government." *Verble v. Morgan Stanley Smith Barney, LLC*, 148 F. Supp. 3d 644, 657 (E.D. Tenn. 2015) (citing *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 567 (6th Cir. 2003)) (other citations omitted), *aff'd*, 676 F. App'x 421 (6th Cir. 2017). The second type of protected activity requires the employee to show the he was "pursuing an effort to stop a *specific* violation (or potential violation) of the FCA of which he or she is aware." *Id.* (emphasis in original) (citing 31 U.S.C. § 3730(h) (other citations omitted); *see also Fakorede v. Mid-S. Heart Ctr., P.C.*, 182 F. Supp. 3d 841, 849 (W.D. Tenn. 2016), *aff'd*, 709 F. App'x 787 (6th Cir. 2017).

The plaintiff here is relying on the second type of activity: taking actions to stop one or more violations of the FCA. The Sixth Circuit has explained that "internal reports 'may constitute protected activity,' provided such internal reports 'allege fraud on the government.'" *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 398 (6th Cir. 2015) (quoting *McKenzie*, 219 F.3d at 516). Accordingly, mere "[g]eneralized complaints about wrongdoing are not sufficient to serve as predicate acts for FCA retaliations." *United States ex rel. Howard v. Lockheed Martin Corp.*, 14 F. Supp. 3d 982, 1023 (S.D .Ohio 2014). To engage in protected activity, an employee must have both a "subjective, good-faith belief" and an "objectively reasonable belief that fraud is being committed against the government." *Miller*, 648 F. App'x at 560 (citations omitted).

CRMCA raises a number of arguments as to why Seabury cannot establish that he engaged in protected activity, the first element of his *prima facie* retaliation claim: that his internal reports "do not rise to the level necessary to constitute 'protected activity'" (Doc. No. 76, at 8) because his internal reports concerned generalized reports of wrongdoing and fell "squarely within the scope of his job responsibilities (*id.* at 11), did not amount to specific reports of FCA violations, and, insofar as they pertain to statements made to counsel for the defendant, are based on inadmissible privileged communications. It also argues that Seabury cannot show that he had a reasonable belief that CRMCA was violating the FCA.

### 1. *"Outside Scope of Employment" Requirement*

Somewhat confusingly, district courts within the Sixth Circuit have repeatedly held that internal reports, to constitute protected activity, must be "outside the employee's scope of employment" and "do more than simply urge compliance with applicable regulations." *Fakorede*, 182 F. Supp. 3d at 849 (quoting *Merritt v. Mountain Laurel Chalets, Inc.*, 96 F. Supp. 3d 801, 822 (E.D. Tenn. 2015)). This requirement appears to stem from *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559 (6th Cir. 2003), in which the court held—prior to the 2009 amendments to the FCA— that, to plead and prove the *notice* element of a *prima facie* retaliation case, employees charged with investigating potential fraud, "[i]n light of their ordinary responsibilities, . . . 'must make clear their intentions of bringing or assisting in an FCA action in order to overcome the presumption that they are merely acting in accordance with their employment obligations.'" *Id.* at 568 (quoting *U.S. ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1523 n.7 (10th Cir. 1996)). As Judge Moore explained in her dissent in *Jones-McNamara*, however, "[g]iven that the current version of § 3730(h) no longer limits protected activity to actions in furtherance of potential FCA actions, *Yuhasz*'s requirement that employees involved in investigating potential

fraud must 'make clear their intentions of bringing or assisting in an FCA action' is no longer required by the statutory text." *Jones-McNamara*, 630 F. App'x at 409 n.6 (Moore, J., dissenting).

That is not to say that the "scope of employment" requirement does not still have relevance to the *notice* element of a *prima facie* case. A plaintiff still must prove that the employer knew that the employee was engaging in protected activity. Although an employee is no longer required to prove that the employer "knew that she was acting 'in furtherance of' a *qui tam* action," the plaintiff/relator's "actions still must convey a connection to the [FCA]." *United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 767 (10th Cir. 2019) (quoting *Ramseyer*, 90 F.3d at 1522). Thus, when an employee who is engaged in "compliance" as part of her job seeks to state a retaliation claim, the compliance employee typically must "do more than other employees to meet the notice element." *Id.* She must allege and show that "her employer knew of her efforts to stop a False Claims Act violation. . . . And so, to adequately plead notice, a compliance employee must allege facts that, viewed in her favor, make clear that her employer had been put on notice that she was trying to stop it from violating the False Claims Act and not merely doing her job." *Id.*

The defendant here attempts to show that Seabury was simply acting in the scope of his employment when he reported internally his belief that the defendant was engaged in conduct that violated the FCA, Stark, or the AKL. Seabury, however, affirmatively denies that he had any compliance responsibilities and points out that the company had a dedicated "compliance" officer. The court finds that there is, at a minimum, a material factual dispute as to whether Seabury could be deemed a "compliance employee" with an enhanced notice obligation.

### 2. Seabury's Reports of Above-Market Physician Compensation

Seabury claims that he engaged in protected conduct when he repeatedly delivered monthly profit and loss statements for the physician practice groups to Langer, to Korth in his capacity as CFO and later as CEO, and to Williams after he was hired as COO, as well as to Comptroller

Tommye Rena Wells and to CRMC's Medical Director, Dr. Jeffrey Gleason, and that each of these statements "showed that every CRMG group practice lost substantial sums of money every single month." (Seabury Decl. ¶ 21.) Seabury cannot, and does not, dispute that the preparation and delivery of these profit and loss statements was part of his job. Moreover, simply delivering profit and loss statements does not constitute notice of, or an effort to stop, fraud on the government. Thus, Seabury has an obligation to show that he did something else to bring to the defendant's attention his belief that these monthly losses constituted fraud on the government, for purposes of showing that he engaged in protected activity.

Seabury asserts that he did just that, beginning in "August and September of 2014," when he read about the *Tuomey* case and began forwarding articles and information about it to Korth. In his Declaration, Seabury states that he had learned that Tuomey, "a regional hospital, not unlike CRMC, paid commercially unreasonable compensation and benefits to its physician employees in exchange for patient referrals, also not unlike CRMC" and was "subsequently hit with a $237,500,000 jury verdict." (Seabury Decl. ¶ 22.) He forwarded articles and notes discussing the *Tuomey* decision to Korth in August 2014 and to Gleason on September 5, 2014, and "spoke to Korth at least twice within the next month or so to ask whether or not he had read the articles." (Seabury Decl. ¶ 22; Doc. No. 81-3.) Korth told him he had not read the articles but had forwarded them to John Beal, and he assured Seabury that "the hospital had nothing to worry about." (Seabury Decl. ¶ 22.) Seabury told him that, although he was not a lawyer, his "review of the 67 pages of professional articles and seminar materials and [his] experience in healthcare were cause for [him] to reasonably believe that CRMC should be worried" and that "the overriding issues were hospitals paying more than fair market value and commercially unreasonable compensation and benefits to their physicians, which was what CRMC was doing." (Seabury Decl. ¶ 22.) Seabury also met with

Beal to discuss the same articles he had given to Korth and to express his concern that the defendant "had a problem with fair market value and the commercial reasonableness of its physician employment contracts." (Seabury Decl. ¶ 22.) Beal apparently did not perceive a problem, so Seabury and Beal "agreed to disagree." (Seabury Decl. ¶ 22.)

The defendant attempts to show that this was not protected conduct by pointing out that Korth denies that Seabury ever had a conversation with him about the *Tuomey* case and its implications for CRMCA. (*See* Doc. No. 76, at 6 ("[Seabury] cannot point to any evidence other than his own disputed testimony that he made such a complaint.").) But the point is that there is a material factual dispute: Seabury has testified that he told Korth, unambiguously, that he believed that the hospital's payments and compensation to doctors violated the FCA, Stark, or the AKL in the same way as the payments by the hospital in *Tuomey* had been deemed to violate the law. Korth denies having this conversation.

To avoid the conclusion that a material factual dispute exists, the defendant then argues that Seabury was simply acting within the scope of his job responsibilities and reporting generalized "wrongdoing" to his supervisors. As indicated above, however, there is a factual dispute as to whether Seabury had any kind of compliance responsibilities such that reports about potential violations of the FCA, Stark, or the AKL were part of his job. Moreover, he was not making a report about generalized wrongdoing but, he claims, a specific report that he believed the hospital was engaged in specific fraudulent conduct that violated specific federal laws. The court finds, in sum, that there is a material factual dispute, precluding summary judgment, on the question of whether the plaintiff engaged in protected conduct when he brought the *Tuomey* case to Korth's attention and expressed his belief that CRMCA was engaged in the same behavior that had resulted in a sizable judgment against the hospital in that case.

The plaintiff's concern about physician compensation in excess of fair market value would apparently encompass his expressing concerns to Korth in March 2015 about payments to a Dr. Hee in excess of the amounts to which she was contractually entitled and above fair market value. In his deposition, he was asked about an email sent to Korth and Beal on March 13, 2015, the "Subject" of which was "Dr. Hee – Pay Adjustments" and the body of which was another article about the *Tuomey* case. (Doc. No. 77-18.) Seabury explained in his deposition that Amanda Manley had contacted him because she had concerns that Dr. Hee was not meeting her contractual obligation to bring in a certain threshold of income, which should have affected her compensation. (Seabury Dep. 262.) In his Declaration, he further clarified that, under the terms of her employment contract, Hee's compensation should have been reduced, based on her financial performance and failure to meet certain goals. He advised Korth of that fact, but Korth disagreed. Seabury then sent Korth the above-referenced email "with a copy of another article about the *Toumey* [sic] case and the serious dangers associated with providing physicians with compensation and benefits, above fair market value, which were commercially unreasonable." (Seabury Decl. ¶ 26.) Seabury stated that his providing this additional article to Korth was a "statement to Defendant of [his] belief" that "Defendant was continuing to pay its physicians above fair market value, commercially unreasonable compensation and benefits." (Seabury Decl. ¶ 26.)

The defendant also argues that Seabury's reported concerns about physician compensation was not protected activity because his concerns were neither subjectively nor objectively reasonable. In support of that argument, CRMCA asserts that Seabury "admits" that Korth told him Beal was not concerned, despite having reviewed the articles about *Tuomey* that Korth had forwarded to him and "admits" that he did not know what kind of experience Beal had or whether he was "'certified' in healthcare law." (Doc. No. 76, at 14.) Without any legal support, CRMCA

posits that "[i]gnoring expert advise, or discounting it without examining the nature of the advice . . . is not reasonable." (*Id.*) Seabury responds that, at the time, it was "common knowledge among competent healthcare executives and administrators that paying hospital physicians commercially unreasonable compensation and benefits above fair market value violated Stark, Anti-Kickback Law and the False Claims Act because such payments were unlawful inducements for referrals of patients and medical services to the hospital." (Seabury Decl. ¶ 23.) He states that, as a result, he reasonably believed that the commercially unreasonable benefits and compensation that the defendant was paying its physicians were unlawful and made the hospital vulnerable to the same type of claims against it as had been made in *Tuomey*. (*Id.*)

The defendant has not attempted to argue, as a legal matter, that Seabury's concerns were unfounded. Instead, it basically argues that a non-lawyer employee who lacks the ability to definitively determine that some practice violates Stark or the AKL can never reasonably believe a violation of those statutes (or the FCA) has occurred, particularly if the company's legal counsel has opined otherwise. The court is not persuaded that such a high standard of certainty applies. The law is clear that a plaintiff asserting retaliation in violation of § 3730(h) is not required to "complete an investigation into potential fraud or uncover an actual FCA violation to undertake protected activity." *Jones-McNamara*, 630 F. App'x at 399 (citing *Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409, 428 n.1 (2005)). Moreover, in the cases to which the defendant cites, the unreasonableness of the plaintiff's purported belief was patent.

In *Jones-McNamara*, for example, the court observed that the AKL prohibits "knowingly and willfully solicit[ing] or receiv[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or kind . . . in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which

payment may be made in whole or in part under a Federal health care program." *Jones-McNamara*, 630 F. App'x at 400 (quoting 42 U.S.C. § 1320a–7b(b)(1)(A)). The statute defines "remuneration" as "transfers of items or services for free or for other than fair market value." *Id.* (quoting 42 U.S.C. § 1320a–7a(i)(6)). The court found that the plaintiff in that case could not have reasonably believed an AKL violation had occurred, because, first, "it is ludicrous to believe that a person would be tempted to make illegal referrals in exchange for a couple [of] hotdogs once a year," *id.* at 401, and second, the plaintiff "provided no evidence that the people who received hotdogs and hamburgers or the doctor who received [a] jacket were ever in a position to refer business to [the defendant]," *id.* at 402. *See also Miller*, 648 F. App'x at 562 (finding that the plaintiff "did not have an objectively reasonable belief that an FCA violation would occur" where she knew that the bribe she reported was rejected).

The plaintiff's concerns here are not facially so frivolous. The evidence supports the plaintiff's claim that he had a subjectively reasonable, good faith concern that the hospital's remuneration to CRMG physicians was above fair market value, that this excessive compensation could tempt the doctors to make illegal referrals to the hospital, and that this concern was objectively reasonable.

### 3. *Seabury's Concerns About the Hospital's Arrangement with Dr. Davis*

Seabury also reported to Williams and Korth his belief that the hospital's arrangement with Dr. Davis was problematic from a compliance standpoint. Seabury explains that Davis, a pulmonologist, was hired by the hospital around April 2015 to provide outpatient care, but, when he was hired, there was no office or patient examination space for Davis within CRMG's pulmonary practice group. (Seabury Decl. ¶ 32.) CRMCA decided to "set Dr. Davis up as a hospital based physician housed at Defendant's wholly owned Sleep Center, where he used Defendant's offices, examination spaces, equipment, and administrative personnel." (Seabury Decl. ¶ 32.)

According to Seabury, Medicare billing rules required that two separate billing components be submitted to Medicare for reimbursement under these circumstances: one bill for Dr. Davis's professional services and a second bill for the use of the hospital's facilities. (Seabury Decl. ¶ 32.) CRMG could only bill the professional component, and the hospital needed to bill the facility component. (*Id.*)

However, in July 2015, Korth, Williams, Beal, and Comptroller Wells "decided that the hospital would not bill Medicare for the facility or technical component for Dr. Davis's medical services rendered at the Sleep Center." (Seabury Decl. ¶ 33.) Seabury did not participate in this decision, but, when it was brought to his attention, he raised the alarm, telling Williams and Wells that the hospital's failure to bill patients for the facility fee would violate Medicare rules and regulations and constitute "remuneration" to Dr. Davis. (Seabury Decl. ¶ 34.) He expressly stated in an email to Wells that this would be a "compliance" issue, and she agreed. (Seabury Decl. ¶ 34; *see also* Doc. No. 81-5 (July 30, 2015 email exchange).) Seabury thereafter communicated directly with Korth and Williams, explaining that "[n]ot billing the facility fee is deemed remuneration to the physician and every claim we file receives a lower Part B reimbursement associated with his performing services within the facility" and forwarding them an article explaining that the failure to charge would be "remuneration" to the doctor. (Seabury Decl. ¶¶ 34–35; *see also* Doc. No. 81-5 (July 30, 2015 email).) Seabury states in his Declaration:

> This article made me reasonably believe that defendant's failure to charge the facility fee for Dr. Davis's outpatient medical services was a violation of Medicare billing rules and regulations and could result in false bills being submitted to Medicare that violated Stark, Anti-Kickback and False Claims Act Law.

(Seabury Decl. ¶ 35.)

In the context of a subsequent discussion regarding Dr. Davis's billing practices in September 2015, Seabury again questioned Williams about the facility's billing in connection with

Davis's services, asking, "Dr. Davis still does not use Athena as he needs to do . . . Are they charging a technical fee for all?" (Doc. No. 81-6, at 3 (Sept. 25, 2015 email from Seabury to Williams).) Williams's reaction was ambiguous, as it pertained to the doctor's failure to use Athena, the hospital's new electronic billing system. Williams emailed Scott Clayton, director of the Sleep Center, stating, "[W]e've got to get this solved. I need you to get with Duane [Seabury] and CRMG to work this out and make sure that Dr. Davis starts using Athena consistently. This could get us into bigger problems." (*Id.*) Seabury interprets this response as an acknowledgment that his concerns raised a compliance issue. (*See* Seabury Decl. ¶ 36 ("William's [sic] comment . . . is proof that he and the defendant also knew that defendant's failure to charge the facility fee for Dr. Davis's outpatient services was wrongful, a violation of Medicare billing rules and regulations and that the 'bigger problems' could include violations of Start, Anti-Kickback Law and the False Claims Act.").) Seabury followed up with an email to Williams dated October 1, 2015, indicating that they needed to discuss the matter further: "There are some questions not only on procedure but also on the use of the non-disclosure form and what is being charged. Again . . . technically none of my business but I see some potential compliance issues." (Doc. No. 81-6, at 2; *see also* Seabury Decl. ¶ 36.)

The defendant disputes that this report constitutes protected activity by asserting that Williams "addressed" Seabury's concerns "in response to Mr. Seabury's comments" and that "this was nothing more than a report of Mr. Seabury's opinion of a day-to-day operational issue under his management purview, not an effort to prevent actions that had some nexus to a possible FCA violation." (Doc. No. 76, at 12 (citing Statement of Undisp. Material Facts ¶ 84).) The court finds this argument to be deficient. Even in his email to Williams, the plaintiff noted that this issue concerning Davis was "none of [his] business." (Doc. No. 81-6, at 2.) There is simply no evidence

to support the defendant's contention that Seabury's continued communications about the hospital's failure to bill patients in connection with Dr. Davis's use of the hospital's facilities concerned "an operational issue under his management purview." (Doc. No. 76, at 12.) Moreover, there is evidence that the hospital continued not to bill for the use of its facility, despite Seabury's raising the issue as a compliance concern and attempting to get the hospital to bill as it should. The court finds that Seabury's report concerning the hospital's failure to bill in connection with Dr. Davis's use of hospital facilities constitutes protected activity of which the defendant was on notice.

The defendant also attempts to argue that the plaintiff's concern about this practice was not objectively reasonable. The court rejects that argument for the same reasons as those set forth above. Moreover, the comptroller and Williams both appeared to acknowledge the reasonableness of the plaintiff's concerns.

### 4. Seabury's Internal Report to Langer About Fairfield Glade Rent

Seabury asserts that he raised concerns with Dr. Langer in 2012 that the then-proposed rental charge to be offered to Cookeville physicians for examination space, equipment, and staff would not meet the fair market test and "could be construed as an inducement for doctors to refer their patients to CRMC," a complaint that, according to Seabury, anyone in the healthcare industry at that time would know raised the specter of fraud or violation of federal law. (Seabury Decl. ¶¶ 20, 23.) He advised Langer to hire "someone competent to render a fair market value rental number." (Seabury Decl. ¶ 20.) Seabury also testified in his deposition that he never mentioned this concern to Williams because it had been "put to bed" by the time Williams was hired. (Seabury Dep. 143.) He also acknowledged that the defendant actually did obtain an "opinion from the accounting firm" regarding fair market value of the rent to be charged. (Seabury Dep. 143.) Although Seabury did not believe that the fair market value assessment was "proper," he does not

allege that he later complained to Langer or anyone else that the actual (as opposed to proposed) rents charged to physicians at Fairfield Glade were below market value or constituted fraud on the government. Nonetheless, the email could be seen as an effort, and possibly a successful effort, by Seabury "to stop a specific violation (or potential violation) of the FCA of which he or she is aware." *Verble*, 148 F. Supp. 3d at 657. It was, thus, arguably protected conduct.

5.    *Seabury's Email About CMS's Possible Audit of Tennessee Heart*

The plaintiff contends that his reported concerns about Tennessee Heart to Chief Legal Counsel John Beal and Scott Williams in an email dated September 19, 2015 (Doc. No. 64-9) constitutes protected activity. Tennessee Heart appears to be a cardiology group within CRMG.

In this email thread, Paula Duty notified John Beal that CMS had requested records from Tennessee Heart. John Beal asked her if they should "have any concern." (Doc. No. 64-9, at 3.) Duty forwarded the information to Seabury, who emailed Beal, apparently in response to his question about whether the hospital should be concerned about CMS's request for documents. Seabury explained the course of action that he expected CMS to take and the records and contracts he expected CMS to review. Specifically, he noted that CMS was likely to "look at any agreements that may exist between the parties to determine whether those agreements served to act as an inducement to order the services. That always ends in following the money." Doc. No. 64-9, at 2.) He added: "Personally, for whatever the reason, if the government starts fishing I assume they expect to catch something and that always concerns me. Just my nature I guess. Just my opinions. Hope it is nothing." (Doc. No. 64-9, at 2.)

There is no dispute that Seabury had no management or other responsibilities related to Tennessee Heart. (*See* Doc. No. 96, at 41, Pl.'s Resp. to Statement of Undisp. Fact. Nos. 86, 87.) Consequently, the defendant does not contend that any reports about Tennessee Heart fell within the scope of Seabury's job duties. Instead, the defendant argues that Seabury's concerns "lack a

reasonable basis in fact and did not rise beyond a mere report of what he believed would happen, not a suggestion that prior conduct could give rise to FCA violations." (Doc. No. 76, at 12.)[6] In his Opposition, Seabury attempts to dispute that argument by characterizing his email as "warn[ing] Defendant that CMS auditors were likely to discover its above fair market value, commercially unreasonable compensation agreements with Tennessee Heart physicians, which Seabury reasonably believed were unlawful inducements for referrals." (Doc. No. 80, at 23.)

Regardless of how it is characterized, Seabury's email to Beal, copied to Williams, cannot reasonably be viewed as an effort on the part of Seabury "to stop a *specific* violation (or potential violation) of the FCA of which he or she is aware," *Verble*, 148 F. Supp. 3d at 657 (citations omitted) (emphasis in original), or as actually going so far as to allege that CRMCA was committing "fraud on the government." *Jones-McNamara*, 630 F. App'x at 398. Even assuming that the plaintiff had concrete knowledge that the Tennessee Heart physician contracts were for above-market compensation—evidence of which is not in the record—and regardless of what Seabury expected CMS's audit to reveal, the email to Beal and Williams does not qualify as protected activity under the FCA.

6. *Seabury's Concerns About EMR Certifications*

In his Declaration, Seabury explains that, before he was hired by CRMCA, CMS had "established a system of incentive payments to encourage physicians to convert to electronic [medical] record keeping," or EMR. (Seabury Decl. ¶ 24.) In simple terms, for every physician employed by CMCRA who met EMR "designated meaningful use milestones," CMCRA would receive an incentive payment. (*Id.*). Attestation by the physician or her authorized agent that the

---

[6] CRMCA also argues that the email exchange is inadmissible into evidence as a privileged communication, as a result of which Seabury cannot rely on it. The court has already considered and rejected that argument. (See Doc. No. 97.)

physician had met the designated milestones was a prerequisite for the defendant's receipt of incentive payments. (*Id.*) Seabury also specifically avers that it was part of his job to "attest[] that CRMG physicians had met CMS [EMR] meaningful use milestones." (Seabury Decl. ¶ 13.)

In his 2012–13 Senior Leadership Self-Evaluation, Seabury identified as one of his accomplishments that he had "[c]ompleted Attestation for 20 physicians and received $299,700 in incentive funds" for CRMCA (Doc. No. 81-15, at 2), meaning that he had gotten twenty doctors enrolled to use EMR (Seabury Decl. ¶ 24). In addition, he identified as a goal for the next year "achieve attestation status," if "the EMR can be upgraded to certified for Meaningful Use Stage 2." (*Id.*) In his Senior Leadership Self-Evaluation for the subsequent year, he noted that the "EMR upgrade for Meaningful Use Stage 2 has not been accomplished and we are working for Meaningful Use Stage 1 Year 2. However, that upgrade is encountering issues that have yet to be resolved." (Doc. No. 81-16, at 2; *see also* Seabury Decl. ¶ 25.)

In his Declaration, Seabury states that he "refused" to attest that physicians had met the designated milestones when they had not, in fact, done so. (Seabury Decl. ¶ 25.) His refusal was "required to prevent making a false attestation and false claim to CMS in exchange for the defendant's receipt of incentive payments." (Seabury Decl. ¶ 25.) His first such "refusal" occurred in the Fall of 2014 and was ongoing through his termination in 2015.

Although he designates this "refusal" as protected activity and states that Korth was "aware of [his] on-going refusal to so attest" (Seabury Decl. ¶ 47), Seabury does not allege that Korth or anyone else at CRMCA pushed back against his refusal to make a false attestation or that he was ever asked to make a false attestation. In other words, Seabury was simply doing his job when he chose not to falsely attest that CRMG physicians had met EMR milestones. This action does not qualify as an internal report of "fraud on the government," *Jones-McNamara*, 630 F. App'x at 398,

nor was Seabury engaged in trying to stop an FCA violation or potential violation, *Verble*, 148 F.

Supp. 3d at 657. Consequently, it was not protected conduct for purposes of his retaliation claim.

### 7. Seabury's Concerns About "Downstream Referral Income"

Seabury also now claims that he engaged in protected conduct when he expressed concern

to CRMCA management that "they were relying upon and considering the volume and value of

CRMG and Tennessee Heart physician referrals to the Defendant to determine such physician's

compensation and benefits," "warned Korth not to mention downstream referral revenues which

Defendant received from CRMG and Tennessee Heart physicians to justify their physician

practices, which occurred every month for the four years of Seabury's employment," and "warned

DHG not to mention downstream referral revenues in a slide presentation as part of their consulting

work for Defendant in June 2015." (Doc. No. 96 ¶ 70 (citing Seabury Decl. ¶¶ 7, 8, 20–52).)

The "warning" to DHG was contained in an email (apparently forwarded to Williams), in

which Seabury commented on a slide presentation DHG was planning to give. Seabury

"suggest[ed]" that DHG not reference "downstream revenues," as such revenues "should not

matter in this context," both because they were "highly speculative" and because "it isn't the

revenue that matters but the margin generated by the revenue." (Doc. No. 81-7, at 2.) This email

does not constitute evidence that Seabury believed that fraud on the government was occurring or

that he was trying to stop it. Accordingly, apart from the fact that it was directed to DHG rather

than to CRMCA, it does not qualify as protected activity.

Similarly, regarding his "warnings" to Korth, the plaintiff claims that, during monthly

meetings with the defendant's Board of Directors Finance Committee that Seabury also attended

from October 2011 through October 2015, when Korth was "questioned" about the "longstanding

CRMG physician practice losses," he justified them by pointing to the "downstream referral

revenue generated by the Defendant, which more than offset the losses." (Seabury Decl. ¶ 27.)

Seabury claims that he began advising Korth in the fall of 2014 and continued advising him into the summer of 2015 that Korth "should not be discussing or mentioning downstream referral as justification for CRMG's continuing financial losses." (Seabury Decl. ¶ 28.) He also asserts that the articles he sent to Korth (which Korth did not read but sent to Beal) supposedly revealed that consideration of "downstream referrals violated Start, Anti-Kickback, and False Claims Act law." (Seabury Decl. ¶ 28.)

Seabury does not claim that he actually drew that line for Korth; he states only that he advised Korth not to discuss or mention downstream referrals as a justification for the hospital's countenancing of CRMG's continuing financial losses. In other words, the plaintiff's allegations, accepted as true, do not show that he was either reporting fraud or trying to stop fraud against the government. Instead, he was apparently trying to prevent Korth from characterizing the hospital's objectives in such a way as to make it appear that CRMCA was acting unlawfully. As such the plaintiff's "warnings" to Korth do not qualify as protected conduct.

Insofar as the plaintiff is attempting to posit, as separate protected activity, that he "expressed concern" to CRMCA management that "they were relying upon and considering the volume and value of CRMG and Tennessee Heart physician referrals to the Defendant to determine such physician's compensation and benefits" (Doc. No. 96 ¶ 70), his citations to his own Declaration do not support that he expressed any such concerns other than through the above-referenced advice to Korth, except in the context of reporting to Korth that the above-market compensation to physicians was problematic for just that reason. In other words, this purported "concern" merges with that of his reports about above-market compensation and benefits to CRMG physicians.

In sum, the plaintiff has not shown that his reported concerns about downstream referrals constitute separate protected activity.

### C.    Causal Connection Between Protected Activity and Termination

#### 1.    *Legal Standards for the Causal Connection Element*

Section 3730(h) provides a cause of action to any employee who suffers discrimination in the terms and conditions of his employment "because of" the employee's lawful efforts to "stop" one or more FCA violations. Although the Sixth Circuit has not expressly addressed the applicable standard in the FCA context, the language of the statute dictates the conclusion that it is the same standard as that applied in the Title VII context, which "require[s] proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013) (construing the term "because" as used in Title VII's retaliation prohibition); *see also Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1739 (2020) ("Title VII's 'because of' test incorporates the simple and traditional standard of but-for causation." (quoting *Nassar*, 570 U.S. at 350) (some internal quotation marks omitted). "In other words, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not . . . engaged in protected activity." *George v. Youngstown State Univ.*, 966 F.3d 446, 459–60 (6th Cir. 2020) (citation and internal quotation marks omitted). This burden is "not onerous" and, at the *prima facie* stage, "can be met through evidence that . . . the adverse action was taken shortly after the plaintiff's exercise of protected rights." *Id.* (internal quotation marks and citation omitted).

The Sixth Circuit has addressed the relationship between temporal proximity and the *prima facie* element of causation on several occasions and, in *George*, reiterated that, "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal

connection for the purposes of satisfying a *prima facie* case of retaliation." *George*, 966 F.3d at 460 (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). The court continued:

> In such cases, the adverse employment action is often taken just days or weeks from when the employer learns of the employee's protected activity. But even if enough time passes between the protected activity and the adverse action so as to preclude a finding of causation based on the close timing alone, an employee can still prevail if she couple[s] temporal proximity with other evidence of retaliatory conduct to establish causality.

*Id.* (internal citations and quotation marks omitted). The Sixth Circuit has denied summary judgment in cases where an adverse action took place as long as two to three months after the protected activity. *See, e.g.*, *Kirilenko-Ison v. Bd. of Educ.*, 974 F.3d 652, 664–65 (6th Cir. 2020) (citing *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 306 (6th Cir. 2012), as holding that a lapse of two months was sufficient to show a causal connection based on temporal proximity and *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004), as holding that a lapse of three months was sufficient to show a causal connection based on temporal proximity).

### 2. Temporal Proximity in this Case

The plaintiff has shown that there is at least a material factual dispute as to whether he engaged in protected activity when he expressed concerns to Langer about commercially unreasonable physician rent at Fairfield Glade, when he expressed to Korth that he believed that CRMCA was violating the law by providing above-market, commercially unreasonable compensation and benefits to their physicians, apparently with a view to their downstream referrals, and when he reported concerns to Williams about the hospital's arrangement with Dr. Davis. The defendant argues that the plaintiff cannot establish a causal connection between those activities and the termination of his employment.

Regarding the plaintiff's reports to Langer in 2012 that the proposed physician rent at Fairfield Glade would be commercially unreasonable, the plaintiff has no possible argument that this activity is causally connected to his termination in October 2015. He points to no circumstantial evidence of a causal relationship, and the events are not closely related in time. While he claims that Langer cursed and yelled at him continuously while Langer was CEO, Dr. Langer was removed as CEO and replaced by Korth in late 2012. Moreover, as the plaintiff himself acknowledged, the issues he raised were effectively rendered moot when the company obtained a third-party opinion as to the commercial reasonableness of the rent to be charged at Fairfield Glade. The plaintiff does not allege that Fairfield Glade rent was ever an issue between him and Korth or that Williams, who was not employed by the defendant at the time, was later made aware of the plaintiff's conversations with Langer about the issue. The court finds that the plaintiff has not stated a *prima facie* case of retaliation related to this purportedly protected activity.

As pertains to the plaintiff's reports about above-market-value physician compensation and benefits and the Dr. Davis issue, the defendant argues that Seabury cannot point to any evidence, direct or circumstantial, to support his belief that the elimination of his position was causally related to his having engaged in this protected activity. It points out that there are "no smoking gun emails, no notes that suggest Mr. Seabury was terminated improperly, no communications that indicated dissatisfaction or unhappiness with complaints he alleges he raised, no testimony from any witnesses suggesting that his supervisors were upset with his compliance concerns and wanted him gone." (Doc. No. 76, at 18.) In the absence of any other evidence drawing a connection between his reports of FCA violations and his termination, the only possible basis for the plaintiff to satisfy the "causal connection" element of his *prima facie* case is to show an acute temporal

proximity between his protected conduct and his termination. The defendant argues that the plaintiff cannot make that showing either.

In response, Seabury contends, as a legal matter, that the relevant date for purposes of determining the temporal relationship between protected activity and his termination is the date on which the decision to fire him was made, rather than the date on which he was actually fired—a point the defendant does not contest. He further contends that he is entitled to an "adverse inference" regarding the timing of events—that is, an inference that the decision to fire him was made in close temporal proximity to his protected conduct. He points out that Scott Williams's September 14, 2015 email to Mindy Youngblood and Angel Lewis establishes that the decision was made sometime prior to September 14, even though Seabury was not notified about the decision until October 5, 2015. He argues that, because the defendant began treating him with "unvarnished hostility" "from at least June 2015," a "reasonable juror could conclude" that the decision to fire him was made no later than early June 2015. (Doc. No. 80, at 18.) He also argues, without pointing to any supporting evidence, that "[a] reasonable jury could find that any one of [the protected activities he enumerates] was the 'but/for' cause of Seabury's termination—the 'final straw that broke the camel's back' resulting in Seabury's firing." (Doc. No. 80, at 25.)

Having viewed all of the material submitted by the parties, the court finds, first, that the plaintiff cannot point to a single shred of evidence in the record of his being treated with "hostility" in the spring or summer of 2015, prior to his termination.[7] More to the point, the plaintiff has not pointed to any evidence that remotely suggests a causal connection between any of his allegedly

---

[7] Seabury references an email from Scott Williams to the DHG contractors dated June 2, 2015 in which Williams notified them that Seabury could provide "input," but DHG was to "driv[e] the process" with Williams's and Korth's "direction." (Doc. No. 81-7, at 2.) This email does not qualify as hostility directed to Seabury.

protected activity—even that which the court has determined is not protected—and the decision to terminate his employment. As a result, the question is whether the temporal connection between the adverse action and the conduct that qualifies as protected activity under the statute is sufficiently close to permissibly give rise to an inference of causation.

There is little evidence in the record regarding when the decision to fire Seabury was made.[8] Korth attests in his Declaration submitted in support of the defendant's Motion for Summary Judgment that CRMCA retained DHG in March 2015 to "provide recommendations on physician enterprise assessments and planning. (Doc. No. 77-1, Korth Decl. ¶ 11.) DGH "ultimately provided a set of recommendations and made a report to CRMC's Board of Directors"; among these was the suggestion that CRMCA hire a "physician leader for CRMG to promote unity among the CRMG employed physicians" and that it "consider eliminating unnecessary middle management positions at CRMG." (Korth Decl. ¶¶ 11, 12.) "Upon reviewing DHG's report and the recommendations," Korth and Williams together determined that the operational vice president

---

[8] In the Memorandum and Order entered on August 31, 2021, the court denied the plaintiff's separately filed motion seeking—as a sanction for the defendant's purported refusal to answer the interrogatory question of when the decision to terminate his employment was made— an adverse inference that the decision was made in June 2015 and, therefore "in close proximity to his protected, covered conduct." (Doc. No. 97, at 13 (quoting Doc. No. 83, at 11).) As the court stated in that Order, there is no evidence in the record that the relevant witnesses actually remember precisely when the decision was made, and the plaintiff has not shown that he made an effort, when deposing Williams, to pin down with any degree of certainty when, approximately, the decision was made. Instead, when Williams was asked when he and Paul Korth "had discussions about . . . eliminating Mr. Seabury's position," and Williams responded, "I don't remember the exact date" (Doc. No. 83-3, Williams Dep. 115–16), counsel for the plaintiff did not ask any follow-up questions, such as, for instance, whether Williams remembered the approximate date or even the month in which the discussion took place, or how much time passed between that discussion and the date on which Williams notified Seabury that his position was being eliminated. And the plaintiff apparently decided not to depose Paul Korth, despite the fact that Korth was designated as the defendant's Rule 30(b)(6) witness. (*See* Doc. No. 88, at 9.) As the defendant points out, if Seabury had elected to depose Korth, he could, at the very least, have learned what Korth knew and "attempted to establish a date range in which the decision was made." (Doc. No. 88, at 9 n.10.)

position occupied by Seabury could be eliminated and that his responsibilities could be fulfilled by Williams and the employees who had been reporting to Seabury. (Korth Decl. ¶ 14.) But the record does not reveal when DHG submitted its report and recommendations to CRMCA.

The defendant chose not to provide this information, possibly because it is the plaintiff's burden to produce evidence of causation and, thus, temporal proximity. Seabury does not provide this information either, even though the record reflects that the defendant intended to produce the report in discovery. (*See* Doc. No. 83-2, at 8 (Def.'s Answer to Pl.'s Interrogatory No. 5, stating that DHG's report was "being produced in response to this Interrogatory").)[9] The only evidence in the record regarding DHG's activities, though neither party points it out, is that DHG was preparing slides in preparation for a "CRMG interim deliverable presentation" in early June 2015. (*See* Doc. No. 81-7, at 2 (June 1–2, 2015 email thread with the quoted language in the subject line).) Clearly, then, its final report was produced sometime later, but presumably before Williams's September 14, 2015 email discussing the logistics of Seabury's termination.

The last date on which Seabury claims to have engaged in any protected activity related to CRMG physicians' above-market-value compensation and benefits is March 13, 2015, the date on which he emailed Korth another article about *Tuomey*, which, he claims, followed upon a conversation with Korth about Dr. Hee's compensation. (Doc. No. 77-18.) There is no evidence in the record suggesting that the decision to terminate Seabury's position took place within two to three months of that date. Thus, the plaintiff has not established sufficiently acute temporal proximity between the decision to terminate his employment and his allegedly protected conduct

---

[9] Seabury states in his Declaration that he has "never seen" the DHG report upon which the defendant relies, despite the defendant's stated intent to produce the report with its interrogatory answers. If the report was not produced, Seabury should have sought its production, taking efforts up to and including, if necessary, filing a motion to compel. It does not appear that he did so. He clearly had the right to obtain a copy of the report during discovery.

pertaining to physician compensation, standing alone, to give rise to a reasonable inference that his complaints and his termination are causally related.

The court has also found, however, that Seabury's report concerning the hospital's failure to bill in connection with Dr. Davis's use of hospital facilities constitutes protected activity of which the defendant was on notice. Seabury first brought this issue to Williams's attention on July 30, 2015 (*see* Doc. No. 81-5, at 2), but he raised it again in an email dated October 1, 2015 (Doc. No. 81-6, at 2), just days prior to his termination—but also, apparently, after the decision to terminate him had already been made. In any event, these events occurred sufficiently closely in time to establish, for the purposes of the plaintiff's *prima facie* case, a causal connection between his attempts to stop what he reasonably believed to be an FCA violation and his termination. Moreover, it is at least arguable, as the plaintiff contends, that the effect of his complaints was cumulative, such that his complaints about physician compensation and benefits may have also played into the adverse employment decision, even though the temporal proximity between those events is more attenuated.

### D.    Pretext

Once a plaintiff has established his *prima facie* case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's [discharge]." *McDonnell Douglas*, 411 U.S. at 802. As the Supreme Court has explained,

> Establishment of the *prima fac*ie case in effect creates a presumption that the employer unlawfully discriminated against the employee. . . .
>
> The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was [terminated] for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981) (citations omitted). The employer's burden at this stage is one of production, not persuasion. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000).

The defendant here has proffered a legitimate, non-retaliatory explanation for the decision to terminate Seabury's position: in mid-2015, it retained DHG to perform an organizational review. In its final report, DHG made recommendations to Korth and Williams about steps they could take to "increase physician alignment and organizational ownership of operations," including that they hire a "physician leader for CRMG to promote unity among the CRMG employed physicians" and that they consider eliminating unnecessary middle-management positions. (Korth Decl. ¶ 13; Williams Decl. ¶ 7.) Following their receipt of these recommendations, Korth and Williams conferred and decided that the operational vice president position occupied by Seabury could be eliminated and his tasks distributed to already existing employees, including Williams and Seabury's three direct reports, Cheryl Myers, Paula Duty, and Amanda Manley. (Korth Decl. ¶¶ 15, 16; Williams Decl. ¶¶ 8, 9.) They also believed that eliminating the vice-presidential position would allow CRMCA to hire a physician leader for CRMG to "assist with physician issues." (Korth Decl. ¶ 16; Williams Decl. ¶ 9.)

CRMCA has satisfied its burden of production by presenting legitimate business reasons for terminating Seabury's position. Accordingly, under *McDonnell Douglas*, the burden shifts back to the plaintiff to show that the proffered reasons for the adverse action "were, in fact, pretext for retaliation." *Pettit v. Steppingstone Ctr. for the Potentially Gifted*, 429 F. App'x 524, 535 (6th Cir. 2011). "Plaintiffs typically show pretext in one of three ways: '(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that the proffered reasons were insufficient to motivate the employer's action.'" *Miles v. S.*

*Cent. Human Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). "But these are not the only ways that a plaintiff can establish pretext; these three categories are simply a 'convenient way of marshaling evidence and focusing it on the ultimate inquiry: did the employer fire the employee for the stated reason or not?'" *Id.* (quoting *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012)). Regardless of how a plaintiff marshals his evidence, he "must articulate some cognizable explanation of how the evidence [he] has put forth establishes pretext." *Id.* Notably, while temporal proximity in retaliation cases "cannot be the sole basis for finding pretext," it can be "a strong indicator of pretext when accompanied by some other, independent evidence." *Briggs v. Univ. of Cincinnati*, 11 F.4th 498 (6th Cir. 2021) (quoting *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012)).

Seabury does not show that the proffered reason had no basis in fact. The company was restructured and the vice-presidential positions, including the one Seabury had occupied, were never re-filled.[10] Seabury also presents no evidence suggesting that the proffered reasons did not actually motivate the decision or were insufficient to motivate the decision. Instead, Seabury argues that pretext is established by the timing of the event coupled with evidence of the "hostility" with which he was treated before and at the time of his termination, pointing out that Williams (1) considered hiring a professional guard service to escort Seabury to his office to gather his personal possessions and to escort him off-premises; (2) locked his computer during the termination

---

[10] Seabury makes much of the fact that Dr. Richard Terry was hired fifty six days after he was terminated and argues that Dr. Terry was hired to take on much of Seabury's job, insofar has he was hired to work on "aligning" the interests of the CRMG physicians with those of CRMCA. As explained above, however, Seabury's and Korth's definitions of "alignment" do not appear to be the same, and there is no dispute that Dr. Terry was hired simply as an employee and not as an operational vice president of the company.

meeting; and (3) refused to shake his hand at the end of the meeting and basically made him "feel like a criminal." (Doc. No. 80, at 16.) In addition, following his termination, the defendant refused to offer him job-placement help or a good reference and did not tell CRMG employees that Seabury was being fired or, according to Seabury, the true reason for his termination, but it treated the other two operational vice presidents very differently. Specifically, while Seabury was given no advance warning of his termination or time to secure a job while still employed, one of the other two vice presidents was permitted to continue working an additional three months and the other worked another fifteen months after Seabury's termination, and both of them were permitted to retire rather than being terminated. (Doc. No. 80, at 16–17.) Likewise, Seabury contends that the defendant treated Seabury's "counterpart" at Tennessee Heart, who had "the same job duties as Seabury" very differently, in that she was not terminated. (Doc. No. 80, at 17.)

Seabury also argues that "hostile" treatment during the months prior to his termination constitutes evidence that the proffered reasons are pretext for retaliation, including (1) Williams's June 2, 2015 email to the DHG contractors, telling them to disregard Seabury's comments and recommendations; (2) Williams's and Korth's decision to exclude Seabury from participation in DHG's consulting process; (3) the fact that Seabury stopped reporting to CEO Korth and began reporting to COO Williams in June 2015; and (4) the fact that Seabury never received a pay raise after October 2013. (Seabury Decl. ¶ 60.)

Some of these contentions are based purely on Seabury's post-hoc interpretation of the events and some are not supported by any evidence at all.[11] However, the fact that Williams treated

---

[11] For instance, there is no evidence in the record that Seabury had a "counterpart" in the manager of Tennessee Heart, particularly because it is clear that that person was not an operational vice president. That Seabury was not given the opportunity to participate in the defendant's dealings with DHG, the timing of his beginning to report to Williams instead of Korth, and the fact that he did not receive a pay raise in October 2014 simply are not probative of pretext.

the termination of Seabury's position as if Seabury were being fired—by locking him out of his computer during the termination meeting and having him escorted to his office and off the premises—rather than giving him advance warning and an opportunity to retire, is certainly troubling, particularly in light of the fact that the other two operational vice presidents were given the opportunity to retire rather than being fired. The defendant attempts to explain the differential treatment by stating that there was an "urgent" need to focus on the problem of fixing the relationship between the CRMG physicians and CRMCA. (*See* Korth Decl. ¶ 16 ("We were forced to eliminate Mr. Seabury's position while it was still filled because of the pressing need to fix the lack of alignment between CRMC and CRMG that had been going on for some time.").) That explanation, however, cuts two directions: because the problem had been "going on for some time," it is unclear why the company had such an urgent need to fire Seabury without notice, particularly given that there was at least a three-week delay between the decision to terminate him and the meeting during which he was terminated.

While the question presents a very close call, the court finds that the apparently close temporal relationship between Seabury's protected activity (the internal reports of his concerns about the treatment of the hospital's relationship with Dr. Davis) and the decision to terminate him, coupled with the defendant's failure to produce DHG's report, even while relying on it in support of its proffered reasons for deciding to terminate Seabury's position, and the treatment of Seabury as if he were being fired for cause, rather than simply having his position eliminated, together constitute sufficient evidence from which "a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." *Macy*, 484 F.3d at 364.

## E. Failure to Mitigate Damages

While Seabury acknowledges that the defendant "devotes" "four-and-a-half pages" of its brief to "the topic of damages," he does not actually address the arguments raised by the

defendant's arguments. (Doc. No. 80, at 26.) In his Declaration, he testifies about the emotional effects the termination had on him (Seabury Decl. ¶ 61), but he does not talk about his efforts to mitigate his damages by securing substitute employment after being terminated. The defendant, apart from arguing that it is entitled to judgment as a matter of law, indeed devotes four and one-half pages of its Memorandum to arguing that Seabury failed to mitigate his damages by seeking substitute employment and also failed to retain material evidence related to his efforts to secure employment after he was terminated.

Generally, a terminated employee bringing an employment discrimination (or retaliation) case has a duty to mitigate damages by seeking substantially equivalent employment. *See, e.g.*, *Pittington v. Great Smoky Mountain Lumberjack Feud, LLC*, 880 F.3d 791, 799 (6th Cir. 2018); *United States v. City of Warren*, 138 F.3d 1083, 1098 (6th Cir. 1998). This duty "operates to prevent claimants from recovering for damages which they could have avoided through reasonable diligence." *Rasimas v. Mich. Dep't of Mental Health*, 714 F.2d 614, 623 (6th Cir. 1983) (citation omitted). Generally, the plaintiff has the burden of first proving damages with "reasonable certainty," at which point the employer must then "show that the employee failed to mitigate damages by showing that (1) similar positions were available; and (2) the employee did not "use reasonable care and diligence in seeking such positions." *Gunter v. Bemis Co.*, 906 F.3d 484, 490 (6th Cir. 2018) (quoting *Blackwell v. Sun Elec. Corp.*, 696 F.2d 1176, 1192 (6th Cir. 1983); *Rasimas*, 714 F.2d at 624).

The question of the mitigation of damages is "routinely addressed on summary judgment." *Holloway v. Dodge*, No. 1:16cv1075, 2019 WL 3891852, at *2 (S.D. Ohio Aug. 19, 2019) (collecting cases). At the same time, courts routinely deny summary judgment on this issue when there is insufficient evidence in the record that substantially equivalent work was available, *see,*

*e.g.*, *Finch v. Xavier Univ.*, 689 F. Supp. 2d 955, 969 (S.D. Ohio 2010), or on the basis that the reasonableness of a plaintiff's efforts to secure a substantially equivalent job raises a jury question, *see, e.g.*, *Dawson v. Qube Corp.*, 6 F. Supp. 2d 677, 685 (N.D. Ohio 1998).

Here, the defendant attacks the plaintiff's failure to retain evidence of emails showing his efforts to obtain work and also presents evidence that the plaintiff was not reasonably diligent in attempting to secure other work. However, the question of whether the plaintiff's efforts were reasonable raises a question of fact for the jury—including the reasonableness of the plaintiff's determination that he needed to stay in the Nashville area for both personal and financial reasons. And, in any event, the defendant has not presented evidence showing that substantially equivalent work was available, particularly for a person falling within the plaintiff's particular demographic.

The defendant is not entitled to summary judgment based on the plaintiff's failure to mitigate damages.

### F. Attorney's Fees

The defendants expressly acknowledge that, "[b]y choosing to settle with the United States and State of Tennessee, CRMC is require[d] to pay Relator's 'reasonable attorney's fees and costs' pursuant to 31 U.S.C. § 3730(d)(1). As such, that claim is no longer in dispute," though the amount of the fees to be awarded remains to be resolved. (Doc. No. 76, at 2 n.1.) The defendant's motion inexplicably includes a section arguing that the plaintiff's claim for statutory attorney's fees and costs must be addressed through a reasonableness hearing. The plaintiff does not address this assertion, but the court will resolve the matter through its usual procedure. If the parties are unable to revolve the question of attorney's fees and costs among themselves, the plaintiff must present a motion for attorney's fees, to which the defendant will have the opportunity to respond. The court will determine whether a hearing is required once the matter has been fully briefed.

**V.      CONCLUSION**

For the reasons set forth herein, while this ruling substantially narrows the scope of the plaintiff's claim, the defendant's motion will be denied.

An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge